118 F.3d 507
 119 Ed. Law Rep. 834
 Randy SAYLOR, Sr., suing individually, and Debbie Saylor,
suing individually and as next friend of Randy
Saylor, Jr., an infant, Plaintiffs-Appellees,
v.
BOARD OF EDUCATION OF HARLAN COUNTY, KENTUCKY, Defendant,
Sam B. Saylor, Jim Roark, and William A. Lee, Defendants-Appellants.
 No. 95-5319.
 United States Court of Appeals,
Sixth Circuit.
 Argued Jan. 22, 1996.
Decided July 22, 1997.
 
 Durenda L. Lawson (argued), Millward & Jewell, Barbourville, KY, William D. Stark, Jr. (briefed), Barbourville, Kentucky, for Appellee.
 Winter R. Huff (argued and briefed), Law Offices of John G. Prather, Somerset, KY, for Appellant.
 Before: CONTIE, NELSON, and BATCHELDER, Circuit Judges.
 OPINION
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 A fourteen-year-old schoolboy, Randy Saylor, Jr., got into a wild fight with a classmate in a public school in Harlan County, Kentucky. Their teacher, Sam Saylor, punished each of them by administering five licks with a paddle. The paddling left the boys with bruised buttocks.
 
 
 2
 Young Saylor and his parents brought a federal civil rights action alleging, among other things, a violation of substantive due process rights guaranteed by the United States Constitution. The defendants (who include the teacher and the school's principal and assistant principal) ultimately asserted qualified immunity and other defenses in a motion for summary judgment. The district court denied the request for qualified immunity, and this interlocutory appeal followed.
 
 
 3
 Upon de novo review of the record, and treating all genuine issues of fact as having been resolved in favor of the plaintiffs, we conclude that judgment ought to have been entered in favor of the individual defendants on the basis of qualified immunity. The denial of such immunity will be reversed.
 
 
 4
 * Randy Saylor, Jr., was born at Harlan Appalachian Hospital on September 11, 1976. He attended Wallins Elementary School, in Harlan County, from kindergarten through the eighth grade. A younger sister followed him in school.
 
 
 5
 Resort to corporal punishment was not unknown at Wallins, and a number of the teachers kept paddles in their rooms. Prior to the incident out of which this lawsuit arose, according to the boy's deposition testimony, Randy had been spanked by five different teachers (but never by defendant Saylor) beginning as early as the fourth grade.
 
 
 6
 When Randy was in the seventh grade, a teacher named Henry Howard paddled him on the back of the legs hard enough to leave bruises. Upset at this, Randy's parents told the principal, defendant William Lee, that henceforth they did not want the school to administer corporal punishment to either of their children. (A "Code of Conduct" for the Harlan County schools provided that parents who objected to corporal punishment could so notify the proper school official upon enrollment of the student.) Mr. Lee subsequently testified at his deposition that he told all the teachers they were not to spank Randy Saylor.
 
 
 7
 When Randy entered the eighth grade in the fall of 1990, his mother testified, defendant Jim Roark, the assistant principal, was told that the Saylors didn't want their kids whipped in school. Randy's father, similarly, testified that he told both Roark and Lee at the beginning of the school year that he did not want corporal punishment used on his kids at Wallins. Neither Mr. Saylor nor Mrs. Saylor had occasion to convey this message directly to defendant Sam Saylor,[1] Randy's eighth grade mathematics and history teacher. Sam Saylor had been told by Mr. Lee during the prior school year, however, that Randy's parents did not want him spanked at school.
 
 
 8
 A few weeks after Randy started the eighth grade, as the testimony of several witnesses established, Sam Saylor telephoned one of Randy's parents to report a problem with the boy's classroom behavior. Randy and his father met with Sam Saylor at the school the following day. In the course of the meeting, Sam Saylor testified, Randy's father told the teacher, in haec verba, "that if he [young Randy] gives you any more problem ... I'm telling you to bust his ass." The father added, Sam Saylor said, that "if that don't do any good ... you call me and [looking at the boy] I'll take you in front of that class and take my damned belt off and wear your ass out in front of that class." This conversation was reported to Assistant Principal Roark the next day, according to Sam Saylor, and Principal Lee testified that Sam Saylor likewise told him in October that Randy's father had given Sam permission to spank the boy.
 
 
 9
 Randy Saylor, Sr., testified that when his son misbehaved at home, he (the father) would whip him with a belt or a switch. In response to a general question by counsel for the defendants, however, Mr. Saylor denied ever having told Sam Saylor that it was all right for the latter to administer corporal punishment. The father subsequently volunteered that
 
 
 10
 "I have told them people, all of them, if you have any problems with my kids whatsoever in this school, you are to contact me or their mother. If I'm not here that day, I'll miss work the next day to be here. If they need whipped, I'll whip them in front of you."
 
 
 11
 Young Randy testified that he remembered his father telling Sam Saylor, "Well, if he gives you any more problems, call me and I'll take care of him." The boy was not directly asked if he remembered his father telling the teacher to "bust his ass" if young Randy gave the teacher any more problems--nor was this question posed by counsel for either side during the father's deposition.
 
 
 12
 On December 12, 1990, as young Randy later told it, Randy was challenged to fight by a classmate, Brian Turner. Randy was big for his age[2]--much bigger than Brian--but this seems to have been no deterrent as far as Brian was concerned.
 
 
 13
 The trouble started in Mr. Howard's science class, according to Randy's testimony, when Randy felt something on his shoulder. He thought it was a paper wad thrown by Brian Turner, who was sitting a few seats behind him. Randy threw a paper wad at Brian, whereupon the latter, "cussing and carrying on," said he wanted to fight. Randy asked him to name the time, and Brian proposed the next break. (As both boys presumably knew, the Code of Conduct expressly prohibited fighting on school property. In this connection the Code said that "any student who finds himself/herself the victim of harassment should notify a teacher or principal.")
 
 
 14
 When the bell rang at the end of the period, the boys went on to Mr. Saylor's room for their mathematics class. The class was scheduled to begin at 12:45 p.m., but Mr. Saylor was late in getting back from a sixth grade class he had volunteered to teach several days a week during his lunch hour. The sixth grade class was on another floor of the building.[3]
 
 
 15
 When Randy arrived at Mr. Saylor's room, according to Randy's testimony, Brian proposed getting the fight over with then and there. Randy, unfortunately, agreed. Brian swung first, hitting Randy in the face with his fist hard enough to leave a bruise. The boys fought for a time standing up, and Randy then wrestled Brian to the floor. Suggesting that they needed to stop fighting before Mr. Saylor arrived, Randy let Brian up. The latter came at him again, however, so Randy hit him with a plastic garbage can, scattering garbage everywhere. Then Randy hit Brian in the face with a small plastic water bucket, after which Randy started throwing yardsticks. Brian still wanted to fight, so Randy--"getting mad," in his words--picked up a folding metal chair with which he intended to hit the smaller boy. Other students got the chair away, whereupon Randy picked up a second chair. He testified that he was going at Brian with the chair when the assistant principal, Mr. Roark, came to the door and screamed at the combatants to get to his office. Randy threw the chair down and left the classroom.
 
 
 16
 When the boys got to the office, Randy testified, Mr. Roark told them that Mr. Saylor was going to be very angry and would expect them to be paddled; that fighting was against the rules; and that the boys had to apologize to one another. Sam Saylor arrived at the office at about this point and was filled in on the fight.
 
 
 17
 Mr. Saylor may or may not have been angry--Randy testified that "he was kind of angry acting"--but the prediction as to paddling proved accurate. Mr. Saylor told the boys that each of them would get five licks (the maximum permitted under school policy), and he asked Mr. Roark for the latter's paddle.[4]
 
 
 18
 In Roark's presence, but with Randy waiting outside the office, Saylor paddled Brian five times. Asked whether they were "easy licks or hard licks," Mr. Roark said they were "good licks," licks that Roark thought were "appropriate." Brian was not required to lower his trousers during or after the punishment, but school officials learned the next day that the boy's buttocks had been bruised.
 
 
 19
 As for Randy, he initially told Roark and Saylor that he did not want to be paddled.[5] Mr. Saylor responded that the boy would not be allowed back in the classroom unless he took his discipline. Randy again said that he wasn't getting paddled, and Mr. Saylor suggested to him that he speak with his mother on the telephone. Randy attempted to do so, but was unable to reach her.
 
 
 20
 Mr. Saylor returned to his classroom with Brian, but Mr. Roark continued to talk with Randy, urging him to take the paddling. (Roark testified that although Randy's parents had never told him directly they were lifting their prohibition against Randy's being spanked at school, he had understood from Sam Saylor that the boy's father had lifted the prohibition in October. In speaking with Roark, Lee and Sam Saylor after the fight and before the paddling, Randy himself does not appear to have said a word about his parents' current stance on corporal punishment.)
 
 
 21
 Randy still refused the paddling, so Mr. Roark gave him a standard-form letter of suspension. Where the words "Dates of Suspension" were printed on the form, Roark wrote "Parents to school." Mr. Roark explained at his deposition that this meant Randy was to bring his parents to school and would be suspended unless the problem were resolved with the parents.
 
 
 22
 Sam Saylor came back to the office at some point and told Randy that the other students in the math class were being given a test; that Randy's absence was unexcused; and that he would receive a zero if he missed the test. Randy testified that he was also told he would have to repeat the eighth grade; Sam Saylor denied having made the latter statement, and Mr. Roark testified that he did not recall anything of the sort having been said.
 
 
 23
 After returning again to his classroom, Mr. Saylor was summoned to the office to take a phone call. Mr. Roark had left on other business by this time, but Randy was still at the office. On seeing Mr. Saylor, Randy asked if it were too late for him to take the paddling. It wasn't, and Mr. Saylor told Randy to find Mr. Lee or Mr. Roark. (The Code of Conduct provided that "[a] teacher or principal must administer corporal punishment in the presence of a second school official.")
 
 
 24
 Randy went into Mr. Lee's office and informed the principal that he had decided to take the spanking. After finishing a report he was working on, Mr. Lee went to talk with Mr. Saylor.
 
 
 25
 When Lee found Saylor, according to the latter's testimony, Saylor asked him "do you want to watch me bust Randy's butt." After correcting his language, Lee inquired if Saylor wanted him (Lee) to take care of it. Saylor's response, according to Lee, was, "no ... I spanked the other boy and it wouldn't be fair if I don't spank him." Randy testified that Saylor responded, "No, this one's mine...." Randy and both his parents further testified that they did not have any reason to believe that the spanking was for anything other than fighting in the classroom.
 
 
 26
 Randy, Mr. Lee and Mr. Saylor went into Mr. Roark's office, where the paddle was again taken out of the desk. Randy testified that it was an older paddle, perhaps two and a half or three inches wide and fourteen or fifteen inches long.[6] Randy kept his trousers on, as Brian had done, and Mr. Saylor paddled him three times before being interrupted by the ringing of a telephone. The third blow was so hard, Randy testified, "it's just like it knocked the breath out of me."
 
 
 27
 The telephone call was for Mr. Lee, who took it in an adjoining office. Mr. Lee had thought the boy was to receive only three licks, he testified, so when he got back from the call he said something to Randy indicating that the punishment was over. Mr. Saylor, however, explained that there were to be five licks in all. Although Randy said that he didn't want to take any more, according to his testimony, Mr. Saylor then administered the final two licks. The first three had been "fairly hard," in Mr. Lee's opinion, but Lee thought that the last ones were "easy." Mr. Lee further testified that Mr. Saylor's attitude was "normal" at the time of the spanking, that Saylor did not seem upset, and that he did not show any hostility.
 
 
 28
 Randy had started to cry during the spanking, but he composed himself afterwards and went back to class with Mr. Saylor to take the test. The boy wrote only a little, and then told Mr. Saylor that he had forgotten to study the night before and was still shaken up about the paddling. Mr. Saylor told him he could study at home that evening and take the test the next day.
 
 
 29
 Randy attended the final class of the day and then rode home on the school bus, reaching home around 3:10 in the afternoon. He told his mother about the spanking and showed her his bottom, which was bruised and swollen. (A photograph taken that evening shows a large red area on the right haunch. A smaller and somewhat fainter bruise is visible on the left side.) Mrs. Saylor took Randy to a hospital emergency room, where he was examined but not treated. In retrospect (a phrase we suppose preferable to the more obvious one) the defendants acknowledge that the force used in administering the paddling was excessive.
 
 
 30
 Randy's father, when he arrived home after work and saw the bruises, got "real mad," as he later testified. Taking out his 12-gauge shotgun and some shells, he put them in his car and drove to the Wallins school with his family. A baseball game was in progress, and Mr. Saylor asked if anyone had seen Sam Saylor or Bill Lee. No one had, apparently, and neither man could be found at his residence. The Saylors returned home, and Mr. Saylor put up his gun.
 
 
 31
 Mr. and Mrs. Saylor went to the school the next day and made their displeasure known verbally.[7] Randy's father told Lee, Roark and Sam Saylor that they all knew they were not to use corporal punishment on the boy. The father expressed outrage, moreover, that his son should have been punished for defending himself in a fight--something Randy had been taught at home that he should do.
 
 
 32
 Randy's father went before a Harlan County grand jury in January, and the grand jury indicted Sam Saylor on an assault charge. The teacher then requested and received an opportunity to testify before the grand jury himself. After hearing what he had to say, and after hearing from Mr. Lee as well, the grand jury issued a final report recommending that the indictment be quashed. The report said that although Randy's injuries "exceed what would have been reasonable and may very well have been negligently inflicted," the grand jury was now satisfied that the actions of the teacher in disciplining the boy did not amount to criminal conduct. In conformity with the grand jury's recommendation, the indictment was subsequently quashed.
 
 
 33
 Randy may have been the last student to be paddled at the Wallins school, at least for a while. Mr. Lee testified that he told his staff there would be no more spankings in the school--and the state board of education, according to the newspapers, banned corporal punishment throughout Kentucky for most of the 1991-92 school year.
 
 II
 
 34
 Although the final report of the grand jury had hinted that the Saylors might wish to bring a state law negligence action, they elected instead to seek monetary damages in federal court under 42 U.S.C. § 1983 for what was characterized in the complaint as "a cruel and unusual punishment and the brutal, malicious, and excessive infliction of pain and suffering, and a violation ... of the substantive due process and equal protection rights of this Plaintiff as such are guaranteed and provided under the Constitution and laws of the United States."[8] Pendent state law claims were also asserted, along with claims for declaratory and injunctive relief.
 
 
 35
 Pursuant to Rule 12(b)(6), Fed.R.Civ.P., the defendants moved to dismiss the complaint for failure to state a claim upon which relief could be granted. Citing Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), the district court dismissed the portion of the complaint that alleged a violation of the Cruel and Unusual Punishment Clause of the Eighth Amendment. In all other respects the motion to dismiss was denied.
 
 
 36
 After discovery proceedings, the defendants moved for summary judgment on the remaining claims. The summary judgment motion--which raised a defense of qualified immunity, among other things--was denied, except as to a First Amendment issue not relevant here. The district court subsequently granted an extension of time to let the individual defendants take an interlocutory appeal from the denial of qualified immunity. The court declined a request for findings that would have let the defendant board of education have an immediate appeal under 28 U.S.C. § 1292(b).
 
 III
 
 37
 As stated by the Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established [federal] statutory or constitutional rights of which a reasonable person would have known." Although the central issue in many qualified immunity cases is whether a particular constitutional right was "clearly established" at the time of the alleged violation--see, e.g., Walton v. City of Southfield, 995 F.2d 1331, 1335-36 (6th Cir.1993), and the cases there cited--there is a threshold question that sometimes proves dispositive. The threshold question is whether a constitutional or statutory violation has occurred at all. See Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); Purisch v. Tennessee Technological Univ., 76 F.3d 1414, 1423 (6th Cir.1996); Turner v. Scott, 119 F.3d 425 (6th Cir.1997). We turn to this question now.
 
 
 38
 * It seems clear to us that the plaintiffs cannot show that either the principal of the school, Mr. Lee, or the assistant principal, Mr. Roark, violated anyone's constitutional rights. The record contains nothing to contradict the evidence that both men had been told by Sam Saylor in October that Randy's father had authorized the school to use corporal punishment--and there is no basis on which a jury could be permitted to find that the principal and assistant principal lacked a good faith belief that the parents' instructions not to paddle Randy had been withdrawn. Against this background, the caselaw leaves no room for doubt that Mr. Lee and Mr. Roark acted within the limits set by the Constitution when they allowed Randy's teacher to paddle him for fighting in the classroom.
 
 
 39
 As the district court correctly observed in dismissing the plaintiffs' cruel and unusual punishment claim, "[t]he Supreme Court has unequivocally stated that the Eighth Amendment is inapplicable to situations where public school teachers or administrators impose disciplinary corporal punishment. Ingraham v. Wright, 430 U.S. 651, 671, 97 S.Ct. 1401, 1412, 51 L.Ed.2d 711 (1977)." Because the grant of certiorari in Ingraham v. Wright was "limited to the questions of cruel and unusual punishment and procedural due process," id. at 659, 97 S.Ct. at 1406 the Supreme Court had "no occasion [in Ingraham ] ... to decide whether or under what circumstances corporal punishment of a public school child may give rise to an independent federal cause of action to vindicate substantive rights under the Due Process Clause." Id. at 679 n. 47, 97 S.Ct. at 1416.[9] The courts of appeals are not of one mind on the substantive due process question, but we know of no circuit where the precedents indicate that the conduct of Principal Lee and Assistant Principal Roark could be held unconstitutional.
 
 
 40
 The Fifth Circuit, which issued the en banc decision reviewed by the Supreme Court in Ingraham, takes the view that where state law provides "adequate post-punishment remedies to deter unjustified or excessive punishment and to redress that which may nevertheless occur, the student receives all the process that is constitutionally due." Woodard v. Los Fresnos Independent School District, 732 F.2d 1243, 1245 (5th Cir.1984).[10] Corporal punishment of a public school child, as the Fifth Circuit sees it, simply does not "give rise to an independent cause of action to vindicate substantive rights under the due process clause...." Id., citing Ingraham v. Wright, 525 F.2d 909, 916 (5th Cir.1976) (en banc), aff'd on other grounds, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). As the Fifth Circuit said in Ingraham,
 
 
 41
 "We think it a misuse of our judicial power to determine, for example, whether a teacher has acted arbitrarily in paddling a particular child for certain behavior or whether in a particular instance of misconduct five licks would have been a more appropriate punishment than ten licks. We note again the possibility of a civil or criminal action in state court against a teacher who has excessively punished a child." Id. at 917 (footnote omitted).
 
 
 42
 See also Cunningham v. Beavers, 858 F.2d 269, 271 (5th Cir.1988), cert. denied, 489 U.S. 1067, 109 S.Ct. 1343, 103 L.Ed.2d 812 (1989) (no substantive due process claim was stated where a teacher and school principal punished girls five and six years old for "snickering," the punishment having consisted of five swats with a wooden paddle and the girls' buttocks having been bruised to an extent that led a local child welfare office to state "the situation clearly constituted child abuse").
 
 
 43
 In Hall v. Tawney, 621 F.2d 607 (4th Cir.1980)--a decision that our unpublished opinions in Archey v. Hyche, 1991 WL 100586, at * 2 (6th Cir.), and Darden v. Watkins, 1988 WL 40083, at * 3 (6th Cir.), both characterized as "seminal"--the Fourth Circuit took a somewhat different view. Citing Baker v. Owen, 395 F.Supp. 294 (M.D.N.C.) (three-judge court), aff'd, 423 U.S. 907, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975), where it was held that a parent's constitutional right to control the means of disciplining her child was outweighed by the right of teachers and school officials to employ reasonable corporal punishment in the exercise of their own professional judgment, the Fourth Circuit held that the parents of a child who had been paddled at school against the parents' explicit instructions could not show that their constitutional rights as parents had been violated, even though the paddling was alleged to have been "severe" and not "reasonable." Hall, 621 F.2d at 610. The Hall court went on to hold, however, that it was error to dismiss, under Rule 12(b)(6), a substantive due process claim asserted by the child herself.
 
 
 44
 The Hall court emphasized that "[i]n the context of disciplinary corporal punishment in the public schools ... [a] substantive due process claim is quite different than a claim of assault and battery under state tort law." Id. at 613. Substantive due process decisions cannot turn on whether ten licks as opposed to five licks would be excessive, for example; substantive due process, the court indicated, is concerned with violations of bodily security of an altogether different order of magnitude. Id. Nonetheless, said the court, some tortious school punishments may be "so brutal, demeaning and harmful," so "literally outrageous," as to violate the student's Fourteenth Amendment rights--and in this connection, Hall declared,
 
 
 45
 "the substantive due process inquiry ... must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Id.
 
 
 46
 The foregoing passage was quoted by our court with approval in Webb v. McCullough, 828 F.2d 1151, 1158 (6th Cir.1987). Webb is not directly in point here, because it involved a battery that was in no way "disciplinary"--and we stressed the importance of distinguishing the type of battery at issue in Webb from the disciplinary blows inflicted as punishment in Ingraham. There was no indication in the Webb record that "the blows arose other than in anger or from malice."[11] Id. at 1158. In the case at bar, by contrast to Webb, the punishment was administered in school, before an appropriate witness, with consent (at least initially) from the student, and for a purpose that was unquestionably disciplinary. (As we have seen, all three of the plaintiffs in this case acknowledged at their depositions that they had no reason to believe that the spanking was for anything other than the classroom fight.) We take it, nonetheless, that the substantive due process inquiry prescribed in Hall and quoted in Webb is the appropriate inquiry to make in the case now before us.
 
 
 47
 In denying the motion to dismiss the Saylors' substantive due process claim under Rule 12(b)(6), the district court observed that although the complaint alleged reasons for the paddling that may have been constitutionally impermissible, "[t]he physical punishment itself was disciplinary, and does not shock this court's conscience." We agree.
 
 
 48
 The record developed after denial of the 12(b)(6) motion may well reflect carelessness or an unwise excess of zeal on Sam Saylor's part, but we have no hesitancy in saying that, as a matter of law, the bruises caused by the five licks of the paddle on Randy Saylor's fully clothed buttocks were not "so severe ... so disproportionate to the need presented, and ... so inspired by malice or sadism ... that [the paddling] amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Our conclusion on this matter is consistent with the conclusions we reached in Archey (no substantive due process violation where a fifth grader suffered severe bruises on being paddled five times for humming in the boys' bathroom) and in Darden (no substantive due process violation where a fourth grader who had allegedly failed to do his homework received two or three licks with a paddle and was found by an emergency room physician to have been bruised over a three-to four-inch area of the fleshy part of his left buttock).[12]
 
 B
 
 49
 It does not necessarily follow from what has been said so far that there was no violation of anyone's constitutional rights by Sam Saylor, as opposed to Messrs. Lee and Roark. There is a genuine issue of fact as to whether Randy's father authorized Sam Saylor to administer corporal punishment. If the father did not do so--and we must assume, for present purposes, that he did not--Sam Saylor violated the regulations codified in the Harlan County Schools Code of Conduct by spanking Randy against the parents' express wishes. Although, as discussed above, the spanking per se did not constitute a due process violation, it is arguable that the presumed violation of the regulations did. See Franklin v. Aycock, 795 F.2d 1253, 1260 (6th Cir.1986), and Spruytte v. Walters, 753 F.2d 498, 506-07 (6th Cir.1985), cert. denied, 474 U.S. 1054, 106 S.Ct. 788, 88 L.Ed.2d 767 (1986), prison inmate cases cited by the district court in support of the proposition that the Code of Conduct gave rise to a constitutionally protected liberty interest.[13]
 
 
 50
 Assuming, for purposes of analysis, that Sam Saylor did violate young Randy's constitutional rights--and perhaps those of his parents as well--we are not persuaded that the rights in question were so clearly established as constitutional rights that a reasonable teacher in Mr. Saylor's position would have had to realize that a violation of the Code of Conduct would violate the United States Constitution as well.
 
 
 51
 For a constitutional right to be clearly established, as this court has repeatedly noted, "the law must be clear in regard to the official's particular actions in the particular situation." Long v. Norris, 929 F.2d 1111, 1114 (6th Cir.), cert. denied, 502 U.S. 863, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991); Walton, 995 F.2d at 1335. "Thus, the particular conduct of the official must fall clearly within the area protected by the constitutional right, such that a reasonable official would have known that his or her conduct violated the constitutional right." Walton, 995 F.2d at 1336, citing Long, 929 F.2d at 1115. "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances." Lassiter v. Alabama A & M Univ., Bd. of Trustees, 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) (emphasis in original).
 
 
 52
 We are aware of no pre-existing law "dictat[ing]" the conclusion that a disciplinary paddling administered by a school teacher in violation of school regulations would ipso facto violate federal constitutional law. And this conclusion was squarely rejected in Woodard, where the plaintiff, a schoolgirl who was paddled for using abusive language, argued that an assistant principal's violation of the school's parental consent regulation constituted a substantive due process violation. 732 F.2d at 1245. The Fifth Circuit dismissed the girl's argument as simply "semantic." Id. at 1246. Notwithstanding the assistant principal's clear violation of the parental consent regulation, the court held, the paddling "presents neither arbitrary and capricious state action nor inhumane and shocking abuse of official power." Id.
 
 
 53
 If the United States Court of Appeals for the Fifth Circuit is unable to equate a regulatory violation with a constitutional violation in this factual context, we are at a loss to see how an eighth-grade school teacher could be expected to do so. If Sam Saylor knew that the parental prohibition against spanking Randy Saylor was still in force, Sam obviously knew that he was violating the Code of Conduct by administering the paddling. He also knew, no doubt, that he was exposing himself to an action in the Kentucky courts. Perhaps he knew that he was running a risk of more direct action by an irate parent. That Sam Saylor had to have known that he was also violating the United States Constitution, however, is a proposition we cannot accept.
 
 
 54
 The order of the district court denying qualified immunity is REVERSED, and the case is REMANDED with instructions to enter judgment in favor of each of the individual defendants.
 
 
 
 [1]
 Saylor is a common name in Harlan County. Sam Saylor and Randy Saylor, Sr., had known one another all their lives, but they were not aware of any blood relationship. Contrary to speculation offered by the district court at oral argument on the summary judgment motion, there had been no animosity between the two men prior to the paddling. "I thought Sam was a pretty good fellow," Randy Saylor, Sr., testified
 
 
 [2]
 At a deposition conducted in February of 1993, when Randy was 16 years old, Randy testified that he weighed 240 pounds and stood 6'3" in height. At the time of the fight, he estimated, he had been about 5'10"' tall and had weighed 180 pounds
 
 
 [3]
 The plaintiffs' attorneys have suggested that Mr. Saylor might have been late because he was checking on an automatic car wash he owned nearby. The record contains no evidence indicating that Mr. Saylor was not where he said he was, however
 
 
 [4]
 According to Principal Lee, Sam Saylor was one of the teachers who did not keep a paddle in his room. Randy testified to the contrary. Be that as it may, Mr. Lee testified without contradiction that "Mr. Saylor probably spanked less than anybody in that school just about...."
 
 
 [5]
 It is clear that both boys had the option of not accepting this form of punishment. Principal Lee testified that under school policy the student had to agree before corporal punishment would be administered
 
 
 [6]
 According to Randy, Mr. Roark's paddle was longer and narrower than the newer paddles the teachers were supposed to use. Mr. Roark testified that there were two paddle "molds," one for primary grades and one for junior high; the junior high model was a little larger in size. Paddles were often stolen, it appears, and the particular paddle used on Randy could not be found when the boy's father asked for it the following January
 
 
 [7]
 At a school board meeting the following month, Mr. Saylor was complimented on the way he and Mrs. Saylor had handled the matter. "I know some other people," an unidentified speaker said, "that'd been so mad they'd have went up there and killed." Others expressed their appreciation as well, one remarking that "it shows some class to come down here and take care of it this way instead of going wild."
 
 
 [8]
 The equal protection claim has not been pressed in the briefs we have seen, and we assume it has been abandoned
 
 
 [9]
 In Brown v. Johnson, 710 F.Supp. 183 (E.D.Ky.1989), a decision by the same district court that decided the case at bar, the court held that school officials did not violate the substantive due process rights of a nine-year-old schoolgirl by paddling her seven times with sufficient force to bruise her buttocks severely. In noting that the bruises did not "shock the conscience" of the court--a test sometimes used for resolving substantive due process questions--the court repeatedly suggested that in Ingraham v. Wright "the Supreme Court found that a severe beating [20 licks with a paddle] and the resulting hematoma [which required the plaintiff to miss 11 days of school] did not shock its conscience." Brown, 710 F.Supp. at 186. We believe that the result reached in Brown was correct, but the Brown court's reading of Ingraham v. Wright seems incorrect; the Supreme Court did not address the "conscience shocking" question in Ingraham
 
 
 [10]
 Under Kentucky law it is well established that a teacher may be held liable for damages resulting from negligence or deliberate wrongdoing in administering unreasonable or excessive corporal punishment. See Carr v. Wright, 423 S.W.2d 521 (Ky. 1968). If such punishment is administered maliciously, criminal sanctions may be imposed
 
 
 [11]
 In this respect Webb bears some resemblance to P.B. v. Koch, 96 F.3d 1298 (9th Cir.1996)
 
 
 [12]
 The plaintiffs argue on appeal that the paddling could not have been administered as punishment for the fight, and was thus necessarily impermissible, because Randy had already been punished by being suspended. The school officials viewed suspension as a harsher punishment, however, and assuming that the suspension had really started--a point that is in dispute--it is perfectly clear that the suspension was to be revoked if Randy took the paddling. Randy went back to class after the paddling, it will be recalled, and he would not have done so had he been under suspension
 
 
 [13]
 Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), on which Franklin and Spruytte relied in large measure, endorsed a methodology that has now been repudiated in the prison context. See Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Arbitrary corporal punishment in public schools implicates other constitutional considerations, however, see id. at 483-86, 115 S.Ct. at 2300-01, and Sandin does not rule out the possibility that corporal punishment of a school child may be "arbitrary," in a constitutional sense, if administered in clear violation of school regulations