Kathleen COPE and Teresa D. Davis, Plaintiffs–Appellees,

v.

Devra S. HELTSLEY, Individually and in her Official Capacity as Hopkins County Court Clerk, Defendant–Appellant.

No. 95–6696.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 18, 1996.

Decided Oct. 23, 1997.

Rehearing and Suggestion for Rehearing En Banc Denied Dec. 16, 1997.*

---

* Judge Cohn would grant rehearing for the reasons stated in his dissent.

patibility as an appropriate qualification for reappointment to the deputy clerk jobs. On the strength of this proposition the defendant moved for summary judgment on a claim of qualified immunity. Her motion was denied. Upon *de novo* review, we conclude as a matter of law that the defendant was entitled to qualified immunity. The denial of such immunity will be reversed.

William K. Fulmer, II (argued and briefed), Covington, KY, for Plaintiff–Appellee.

Sun S. Choy (argued and briefed), R. Allen Button, Williams & Wagoner, Louisville, KY, for Defendant–Appellant.

Before: NELSON and DAUGHTREY, Circuit Judges; COHN, District Judge.[**]

NELSON, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. COHN, D.J. (461–462), delivered a separate dissenting opinion.

## OPINION

DAVID A. NELSON, Circuit Judge.

This is a civil rights action brought against a newly-elected Kentucky county clerk by two deputy clerks who were passed over for reappointment when the defendant took office. There is a dispute as to whether the defendant's decision not to retain the plaintiffs was based on the latters' job performance, as opposed to the fact that they had backed other candidates in primary and general elections won by the defendant.

Regardless of how this factual dispute might be resolved, the defendant took the position before the district court that no clearly established legal rule would have made it manifestly unreasonable for a person standing in her shoes to treat political com-

I

Under § 99 of the Kentucky Constitution, each county in the Commonwealth is to elect a county clerk—referred to in the Constitution as a County Court Clerk[1]— every four years. These officials function as county recorders, and they also have significant responsibilities with respect to voter registration and the conduct of elections, motor vehicle licensing, registration of marriages, issuance of hunting and fishing licenses, collection of certain fees and taxes, and other matters, including an increasing number of unfunded mandates imposed from the state capitol in Frankfort.

Western Kentucky's Hopkins County—described in deposition testimony as a "small Southern type county" with a population of around 45,000—had a long-time county clerk named William Brooks. Mr. Brooks first won election to the county clerk's position in 1973, and he retired for reasons of health at the end of his fifth term in 1993.

At the time of his retirement there were 14 full-time deputy clerks on Mr. Brooks' staff, plus two part-time deputy clerks. All were registered Democrats, except for one Republican appointed at the request of the defendant, Devra Heltsley, after the November election. (Mr. Brooks had a policy of appointing only members of his own political party; his successor, Mrs. Heltsley, did not automatically exclude Republicans from consideration, notwithstanding that she too was a Democrat.)

[**] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

1. Under Kentucky nomenclature, which may hark back indirectly to the medieval *Curia Regis*, a court is not necessarily a judicial body. Unless otherwise provided by law, for example, all corporate powers of a Kentucky county are exercised by a "fiscal court." K.R.S. 67.080(e). The county clerk in a given county may or may not serve as clerk of the fiscal court, see K.R.S. 67.120(1), but courts of justice have their own clerks regardless.

The deputy clerks were appointed by the clerk and served at his pleasure. They had no statutory civil service protection. *Cf. Moss v. Robertson,* 712 S.W.2d 351, 353 (Ky. App.1986) (deputy clerks are "political appointees," lacking "merit or civil service status," who "obtain and hold their jobs at the will and pleasure of" the elected county clerk).

Mr. Brooks testified that during his tenure in office he told his employees that he would expect them to vote for him at election time. According to the defendant's deposition testimony, the deputies were given to understand "that if Mr. Brooks was not reelected ... [his successor] could come in and clean house the next day...." Another witness testified that all deputy clerks were asked to campaign for Mr. Brooks at election time. They all did so, apparently.

Mrs. Heltsley was hired by Mr. Brooks as a deputy clerk in 1983 or 1984. She testified that she had been a polling place worker for Mr. Brooks during two elections prior to her appointment, and she had been recommended for the deputy clerk position by the county judge-executive.

Plaintiff Kathleen Cope, a friend of Mr. Brooks' daughter (herself a deputy clerk until 1993), was hired as a deputy clerk two or three years after Mrs. Heltsley. It was Mr. Brooks' impression that Heltsley and Cope, who worked together in the motor vehicle licensing department for several years, had problems getting along with one another. Mrs. Cope, however, testified that she liked Mrs. Heltsley.

Plaintiff Teresa Davis was the daughter of a former Hopkins County magistrate. Her father had served on the fiscal court for 24 years, she testified. Mrs. Davis knew Mr. Brooks through her father, and she worked in the county clerk's office for a short time in the 1970s after her father asked Mr. Brooks to keep her in mind for a job. Mrs. Davis left the clerk's office to work first in the tax commissioner's office and then in the sheriff's department. In 1979 she decided to stay home to raise her children—this was about the same time that her father retired as magistrate—but she returned to the work force a few years later. In 1990 or 1991 she asked Mrs. Heltsley, who had been her classmate in high school, about getting a job in the clerk's office. Mrs. Heltsley said she thought there was going to be an opening, so Mrs. Davis spoke to Mr. Brooks about it. He hired her as a part-time deputy clerk in the motor vehicle licensing department. Mrs. Davis started working full time several months before the 1993 election.

At some point in 1991 or thereabouts, after Mr. Brooks had been in the hospital and at a time when rumors were circulating that he might not run for reelection, a magistrate named Wayne Browning asked if he could be the first to be told should Brooks decide not to run. Mr. Brooks responded in the affirmative.

Early in January of 1993 Mr. Brooks made up his mind not to stand for reelection. He so advised Mr. Browning, and he asked Browning for a commitment not to discharge anyone in the clerk's office if Browning should be elected clerk. Browning agreed.

Mr. Brooks called his employees into his office the next day, told them of his decision not to run, and suggested that they support Mr. Browning. Mrs. Heltsley replied that she was interested in running for election herself. Mr. Brooks said he was sorry he had not known of her interest earlier, adding that he would not be able to support her now because he was already pledged to support Browning.

The primary election was held in May of 1993, with Mrs. Heltsley, Mr. Browning, and three other candidates seeking the Democratic nomination. Mrs. Cope and Mrs. Davis actively supported Browning, as did several of their co-workers in the clerk's office. Others supported Mrs. Heltsley—sometimes wearing pink clothing to signify that they were part of Heltsley's "pink team," as it came to be called—while the rest of the people in the office apparently remained uncommitted until the primary was over.

After Mrs. Heltsley won the primary, everyone in the clerk's office except Mrs. Cope and Mrs. Davis came out in support of Heltsley's candidacy for election in November. The Republican candidate, a dental hygienist

named Retha Tarter, was supported by Cope and Davis. Mrs. Cope—who called Mrs. Tarter after the primary to offer help in placing yard signs for the Tarter campaign—told Mrs. Tarter that, as a sometime Browning supporter, she was concerned about being able to keep her job if Mrs. Heltsley won the general election.

Mrs. Cope's concern about keeping her job was not misplaced, although it is uncertain whether and to what extent Mrs. Heltsley may have been influenced by Mrs. Cope's support of other candidates. Mrs. Heltsley knew about the Supreme Court's decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)—a decision expanding the contexts in which the Court recognizes constitutional limitations on the extent to which political considerations may be taken into account in state government personnel actions [2]—and Mrs. Heltsley has denied that her decision to dispense with the services of Mrs. Cope and Mrs. Davis was based on their support of either Mr. Browning or Mrs. Tarter. "I would not have hired these two plaintiffs," Mrs. Heltsley testified at her deposition, "if they had campaigned for me the full-time."

The stated reasons for Mrs. Heltsley's dissatisfaction with the job performance of Mrs. Cope and Mrs. Davis included an excessive number of mistakes in handling paperwork, rudeness to customers, use of office telephones and fax machines by Mrs. Cope for her own business ventures, and high absenteeism on Mrs. Davis' part. Both employees allegedly failed to provide the sort of customer service Mrs. Heltsley wanted to stress—she cited as one example a written complaint from a customer who claimed he had been left standing in line for 30 minutes while Mrs. Cope and Mrs. Davis discussed personal matters—and the two women were faulted for excessive personal phone calls and for causing friction within the office.

Shortly before the end of December, 1993, Mrs. Heltsley notified Mrs. Cope and Mrs. Davis that their employment would terminate upon the expiration of Mr. Brooks' term and they would not be reappointed. Before taking this step, Mrs. Heltsley testified, she consulted not only the county attorney and a representative of the Attorney General's office, but Bob Babbage's right hand man in the Secretary of State's office and the county clerks of at least two other counties. We are not privy to the substance of any of these conversations. There is a genuine issue of fact as to Mrs. Heltsley's motivation in deciding not to rehire the plaintiffs,[3] and, given the procedural posture of the case, we must assume for present purposes that the issue would be resolved in favor of the plaintiffs if submitted to a jury.

## II

The plaintiffs commenced their lawsuit in August of 1994, filing a complaint against Mrs. Heltsley—both individually and in her official capacity—in the United States District Court for the Western District of Kentucky at Owensboro. As amended the following year, the complaint alleged among other things that the case arose under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. §§ 1983 and 1988; that the plaintiffs had been removed from their positions as deputy clerks because of their publicly expressed support for Mr. Browning and Mrs. Tarter and not because of their performance on the job; that under the Supreme Court's decision in *Rutan*, the defendant's actions violated free speech rights guaranteed to the plaintiffs by the First and Fourteenth Amend-

2. Under date of April 1, 1993, Kentucky Secretary of State Bob Babbage sent a memorandum to all candidates for local office, including Mrs. Heltsley, on the subject of *Rutan*. "Essentially," Mr. Babbage wrote, "the Court held that employment or dismissal based on political support, in certain instances, is unconstitutional, especially when it violates the First Amendment rights of an employee." Babbage cautioned that "with few exceptions," elected officials could not use political activity or support of a particular candi-date as a basis for a worker's retention or nonretention. *Rutan* and the earlier cases on which it rests are discussed in Part III, *infra*.

3. We should add that there was testimony—denied by Mrs. Heltsley—indicating that when Heltsley heard Cope was supporting Tarter, she complained about it to Brooks and said something to the effect that she did not think Cope ought to be able to work there.

ments; and that liberty interests in the plaintiffs' good names had been impaired in violation of the Due Process Clause of the Fourteenth Amendment. The plaintiffs sought compensatory and punitive damages and an award of costs and attorney fees.

After extensive discovery, defendant Heltsley moved for summary judgment. In the brief accompanying her motion she argued (1) that the plaintiffs had no due process liberty claims; (2) that the First Amendment claims were barred because of the plaintiffs' failure to apply for reemployment; (3) that Mrs. Heltsley could not be held liable in her official capacity because there was no evidence that the alleged constitutional violations were the result of any Hopkins County policy; (4) that the plaintiffs had produced no evidence that their political expression was a substantial or motivating factor in the decision not to rehire them; (5) that Mrs. Heltsley was entitled to take political considerations into account when hiring deputy clerks, the deputies being "alteregos" of the clerk herself; and (6) that Mrs. Heltsley was entitled to qualified immunity because a reasonable officer presented with the facts known to her would not have believed that she was violating any clearly established constitutional right of the plaintiffs in failing to rehire them.

After consideration of the defendant's motion, a response thereto by the plaintiffs, and a reply by the defendant, the district court issued a carefully crafted opinion and order (1) granting summary judgment to the defendant insofar as she had been sued in her official capacity; (2) granting summary judgment to the defendant individually on the plaintiffs' Fourteenth Amendment due process liberty claims; (3) denying summary judgment to the defendant individually on the plaintiffs' First Amendment claims; and (4) denying qualified immunity.

Notwithstanding the absence of a final judgment, the defendant filed a timely notice of appeal. (It is undisputed that the defendant was entitled to an interlocutory appeal under *Mitchell v. Forsyth*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).) The plaintiffs obtained permission from the district court to seek interlocutory review of the

disposition of their official capacity claims, but a panel of this court declined to allow such review. The plaintiffs' cross-appeal was dismissed for lack of jurisdiction, and only the qualified immunity question is before us now.

### III

■ Under the doctrine of qualified immunity, as explained by the Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), government officials engaged in the performance of discretionary functions are generally "shielded from liability [and, indeed, from suit] for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Cf. Anderson v. Creighton*, 483 U.S. 635, 638-39, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Pray v. City of Sandusky*, 49 F.3d 1154, 1157-58 (6th Cir.1995); *Saylor v. Bd. of Educ. of Harlan Cty. Ky.*, 118 F.3d 507, 512 (6th Cir.1997).

■ There are no statutory rights at issue in the case at bar. As we have seen, however, the plaintiffs assert that Mrs. Heltsley violated their constitutional right of free speech by her allegedly retaliatory refusal to make them members of her staff. This claim—which the citizens of Hopkins County would doubtless have considered bizarre had it been asserted back when Mr. Brooks was elected county clerk for the first time in 1973—rests on decisions rendered by the United States Supreme Court in *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). The *Elrod-Branti-Rutan* trilogy teaches that "the First Amendment forbids government officials to discharge ... [or transfer or fail to promote, recall or hire] public employees solely for not being supporters of the political party in power, *unless party affiliation is an appropriate requirement for the position involved.*" *Rutan*, 497 U.S. at 64, 110 S.Ct. at 2732 (emphasis supplied). *Cf. Faughender v.*

*City of North Olmsted, Ohio,* 927 F.2d 909 (6th Cir.1991); *Rice v. Ohio Dep't of Transp.,* 14 F.3d 1133 (6th Cir.), *cert. denied,* 512 U.S. 1207, 114 S.Ct. 2678, 129 L.Ed.2d 812 (1994). As we shall see, the case at bar turns on the clarity with which the contours of the italicized exception had been mapped in 1993.

### A

The first argument presented by defendant Heltsley on appeal is that she comes within the "appropriate requirement" exception as a matter of law. Political support of the county clerk by her deputies is necessarily an appropriate requirement for the deputy clerk position, Mrs. Heltsley contends, because the duties of the position are inherently political and because the deputies are "alter egos" of the county clerk under Kentucky law. It follows, Mrs. Heltsley submits, that the plaintiffs have failed to make a colorable claim that their constitutional rights were violated at all.

The logical first step in deciding whether there is a colorable claim that a defendant has violated a "clearly established" constitutional right is to decide "whether the plaintiff has asserted a violation of a constitutional right at all." *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Christophel v. Kukulinsky,* 61 F.3d 479, 485 (6th Cir.1995); *Purisch v. Tenn. Technological Univ.,* 76 F.3d 1414, 1423 (6th Cir.1996); *Turner v. Scott,* 119 F.3d 425, 429 (6th Cir.1997). Mrs. Heltsley thus proceeds in the analytically appropriate manner when she starts her argument with the proposition that a failure to rehire the plaintiffs for the reasons alleged in the complaint would not have violated the Constitution under any circumstances.

The legal correctness of this proposition, however, is not necessarily self-evident. For the panel to come to a consensus on the issue might prove difficult, and it would seem sensible to pretermit the question if that be permissible.

Had discovery not been completed here, we should probably have had no choice but to decide the threshold issue head-on. See *Siegert,* 500 U.S. at 232–233, 111 S.Ct. at 1793–94. But the discovery phase of this case appears to be over, or substantially over, and we believe it is therefore open to us to assume the existence of a constitutional violation without deciding it. This is the course we elect to follow.

### B

Assuming that Mrs. Heltsley did violate the Constitution in declining to hire the plaintiffs as deputy clerks, we must address the question whether the constitutional rights and wrongs of the situation were so clearly established, in December of 1993, that any reasonable official in Mrs. Heltsley's position would necessarily have realized that the plaintiffs had a constitutional right not to be rejected as deputy clerks because of political incompatibility with the clerk herself. We begin our analysis of this question with a brief survey of some pertinent legal principles.

#### 1

■ It is important to understand that Mrs. Heltsley's own subjective views on the legality of her staffing decisions are essentially irrelevant. *Cf. Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40 ("Anderson's subjective beliefs ... are irrelevant"). Whatever she may actually have thought about the constitutional propriety of what she was doing, the pertinent test is an objective one, not subjective. The Supreme Court decided more than 15 years ago that where qualified immunity is concerned, the game of trying to determine the subjective good faith of public officials performing discretionary functions is simply not worth the candle. *Harlow v. Fitzgerald,* 457 U.S. at 815–19, 102 S.Ct. at 2736–39. The applicable standard is now recognized as one of "objective legal reasonableness." *Id.* at 819, 102 S.Ct. at 2739; *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3038–39; *Pray,* 49 F.3d at 1158.

■ This standard requires the courts to examine the asserted right at a relatively high level of specificity. The right must have been "clearly established" not just in an abstract sense, but in a "particularized" sense. *Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. Claims of immunity are thus to be analyzed

"on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendant['s] position could have believed that his conduct was lawful...." *Pray,* 49 F.3d at 1158. *Cf. Garvie v. Jackson,* 845 F.2d 647, 650 (6th Cir.1988); *Guercio v. Brody,* 911 F.2d 1179, 1184 (6th Cir.1990), *cert. denied,* 500 U.S. 904, 111 S.Ct. 1681, 114 L.Ed.2d 76 (1991); *Cullinan v. Abramson,* 128 F.3d 301, 310 (6th Cir.1997). And the burden of convincing the court that the law was clearly established under this particularized "could have believed" test is a burden that rests squarely on the plaintiff. *Hughes v. City of North Olmsted,* 93 F.3d 238, 241 (6th Cir.1996).

■ The importance of the specific factual context in which a qualified immunity question arises may be seen in *Cagle v. Gilley,* 957 F.2d 1347 (6th Cir.1992), where we reversed a denial of qualified immunity to a newly-elected Tennessee sheriff who had refused to rehire four deputy sheriffs because of their support of his opponent during the election campaign. Pointing out that "[t]he parties have not directed the court's attention to a single Supreme Court or Sixth Circuit decision holding ... that political affiliation is not a proper job requirement for a deputy sheriff upon application of *Elrod* and *Branti* principles," *id.* at 1349,[4] this court held that *Elrod* and *Branti* alone were not sufficient to establish with the requisite clarity "that a sheriff could not refuse to rehire his deputies for politically motivated reasons." *Id.* at 1348.

*Cagle* was cited with approval in *Mumford v. Zieba,* 4 F.3d 429, 434–35 (6th Cir.1993), where the panel noted that "[t]his circuit determined [in *Cagle* ] that reliance on the dictates of *Branti* and *Elrod* alone [was] insufficient to prove that the law was clearly established [in the deputy sheriff context]." The *Mumford* panel relied heavily on *Cagle*

in reversing a denial of qualified immunity to a newly-elected domestic relations court judge who, acting in his administrative capacity, had declined to reappoint a referee whom the successful candidate had observed in the act of distributing campaign literature for an opposing candidate.

■ What these decisions and others like them show, in sum, is this: "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances.*" *Saylor,* 118 F.3d at 515, quoting *Lassiter v. Alabama A & M Univ., Bd. of Trustees,* 28 F.3d 1146, 1150 (11th Cir.1994) (en banc) (emphasis in original).

■ There is one other legal principle we need to explain at this point, before turning to the specifics of the case at hand. Referred to in *McCloud v. Testa,* 97 F.3d 1536, 1542 (6th Cir.1996), as "the *Rice* canon," the principle is this: Where the legislature has classified a particular job as political, choosing not to accord it civil service protection, the "appropriate requirement" exception to the *Elrod–Branti–Rutan* rule "is to be construed broadly, so as presumptively to encompass positions placed by the legislature outside of the 'merit' civil service." *McCloud,* 97 F.3d at 1542. If one believes in representative government, the logic of the *Rice* canon is obvious:

> "The outer limits of what is appropriate are now subject to determination by the courts [footnote omitted], but within those limits, surely, the judgment of the people's elected representatives merits respect.

> \* \* \* \* \* \*

> "Even after *Elrod* and *Branti,* the legislature's decision as to whether a particular

---

4. "Ordinarily, to find a clearly established constitutional right, a district court within the Sixth Circuit must find binding precedent from the Supreme Court, the Sixth Circuit, or from itself. *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988). Although decisions of other courts can clearly establish the law, such decisions must both point unmistakenly to the unconstitutionality of the conduct and

be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct was unconstitutional." *Id.* at 1348. "[I]t is only in extraordinary cases that we can look beyond Supreme Court and Sixth Circuit precedent to find 'clearly established law.'" *Walton v. City of Southfield,* 995 F.2d 1331, 1336 (6th Cir.1993).

job should be classified as political or non-political is at least entitled, as the First Circuit has said, to 'some deference.'" *Rice*, 14 F.3d at 1142–43, quoting *Jimenez–Fuentes v. Torres Gaztambide*, 807 F.2d 236, 246 (1st Cir.1985).

### 2

■ Would it have been possible, at the end of 1993, for a reasonable person, newly-elected a Kentucky county clerk, to believe that the law entitled her to take political compatibility into account in deciding whom to retain as her deputy clerks? The answer, we think, is "yes."

In the first place, there was no published decision of the United States Court of Appeals for the Sixth Circuit—and certainly no decision of the United States Supreme Court—holding that political compatibility is not, in the words of *Rutan*, "an appropriate requirement for the position involved." 497 U.S. at 64, 110 S.Ct. at 2732. *"[I]n the circumstances"* of the present case, pre-existing law did not "truly compel" the conclusion that in selecting her staff—the public face of the county clerk's office—the clerk could not take political compatibility into account. *Saylor*, 118 F.3d at 515.

*Christian v. Belcher*, 888 F.2d 410 (6th Cir.1989), a case interpreted by the district court as holding that "a [Harlan County] judge executive was constitutionally prohibited from dismissing a [Harlan County Flood Plain Administrator and Building Inspector] solely because of political association and/or expression," was a case that did not involve a deputy county clerk, did not involve a claim of qualified immunity, and does not seem to us to have gone any further than holding that "there is a genuine issue of material fact as to whether the duties of the Harlan County FPA were such as to make political loyalty an 'appropriate' job requirement." *Id.* at

416. (The existence of a genuine issue of fact as to whether political loyalty is an appropriate requirement for a particular job obviously does not preclude a belief on the part of a reasonable appointing official that political loyalty is in fact an appropriate requirement.) [5]

In the second place, the Kentucky Revised Statutes contain provisions which a reasonable county clerk could easily interpret as meaning that a deputy county clerk is the alter ego of the county clerk herself. See K.R.S. 62.210 ("[t]he office of the county clerk ... shall be liable for the acts or omissions of deputy clerks") and K.R.S. 382.990(5) ("[a]ny county clerk who, by himself or deputy, fails to perform any duty enjoined upon him ... shall be fined ..."). See also K.R.S. 61.035—held applicable to county clerks and their deputies in *Hallahan v. Cranfill*, 383 S.W.2d 374 (Ky.1964)—which provides that any duty "enjoined by law or by the Rules of Civil Procedure upon a ministerial officer, and any act permitted to be done by him, may be performed by his lawful deputy." An elected county clerk engaged in the selection of his or her own alter egos could reasonably believe political compatibility to be an appropriate test.

■ In the third place, "[t]o determine whether political considerations are appropriate in making personnel decisions for a certain position, [one] must examine the inherent duties of that position and the duties that the new holder of that position will perform." *Faughender*, 927 F.2d at 913 (analyzing the duties of a secretarial position to which an appointee of a former mayor had not been appointed by the mayor's successor). "If this examination reveals that the position is inherently political in nature, then political affiliation is an appropriate requirement for the job." *Blair v. Meade*, 76 F.3d 97, 100 (6th Cir.1996). A reasonable county clerk

---

5. *Conklin v. Lovely*, 834 F.2d 543 (6th Cir.1987), on which the district court also relied, did involve a deputy county clerk, but in Michigan, not Kentucky. Under Kentucky law it is at least arguable that a deputy county clerk is the alter ego of the county clerk; whether the same argument could be made under Michigan law was not addressed in *Conklin*. Moreover, *Conklin* contains no analysis of the question whether political

loyalty is either an appropriate requirement for appointment to a Michigan deputy county clerk job or a requirement which a reasonable county clerk could have thought to be legally appropriate. The central issue addressed by the panel in *Conklin* was whether the evidence presented at trial was sufficient to support a verdict for the plaintiff on causation. In the case at bar, of course, causation is not currently an issue.

examining the duties placed on the county clerk's office by statute—duties which any deputy clerk might be called upon to perform—could honestly believe, rightly or wrongly, that the position of deputy clerk is inherently political in nature.[6]

Finally, a reasonable county clerk acquainted with what we have called "the *Rice* canon" would know that the legislature's decision to treat the deputy clerk's position as political, while by no means controlling, is entitled to some deference. *Rice*, 14 F.3d at 1133. Such a clerk would know, in other words, that the "appropriate requirement" exception to the general rule laid down by the Supreme Court in *Elrod* and *Branti* is an exception that must be construed broadly in a case such as this one. *McCloud*, 97 F.3d at 1542.

Three justices of the United States Supreme Court have subscribed to the view that "[i]t is hard to say precisely (or even generally) what [the 'appropriate requirement'] exception means. . . ." *Rutan*, 497 U.S. at 92, 110 S.Ct. at 2746 (Scalia, J., dissenting). If it is hard for even one Supreme Court Justice to say what the exception means, it could be no less hard for a Kentucky county clerk to say what it means: For the reasons we have tried to suggest, we think the clerk could reasonably believe that the exception applies to the selection of deputy clerks. That being so, we conclude that County Clerk Heltsley is entitled to prevail on her claim of qualified immunity against suit in her individual capacity.

Insofar as Mrs. Heltsley's claim of qualified immunity was denied in the order entered by the district court, the order is **REVERSED**.

COHN, District Judge, dissenting.

I dissent. As stated by the district court:

Plaintiffs['] conduct in choosing to support political candidates other than Defendant constitutes constitutionally protected conduct. As decided above, Defendant has not demonstrated that party affiliation is an "appropriate" requirement for all sixteen deputy clerk positions. Furthermore, based upon the above case law,[1] other County Clerks in Defendant's position would have clearly understood that they were under an affirmative duty to refrain from taking such adverse employment action against public employees because of political association or expression. Therefore, "assuming arguendo, that political affiliation was a 'substantial' or 'motivating' factor in Defendant Heltsley's decision not to rehire the Plaintiffs," she is not entitled to qualified immunity for that conduct.

The memorandum from the Kentucky Secretary of State notified defendant of the decision in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), stating that "[t]he ruling issued means that elected officials, with few exceptions, cannot use political activity or support of a particular candidate as a basis to retain or not retain a worker or as the basis for hiring new workers." The memorandum also warned: "It is possible that candidates who seek office with an extensive slate of deputies could run the risk of being sued for improper hiring decisions." If nothing else, the memorandum put defendant on clear notice that if she wanted to reorganize her staff, political consideration should not play a

---

6. The index to Baldwin's Kentucky Revised Statutes Annotated contains five columns of small print under the heading "County Clerks." The reader who is interested may consult this index for a complete listing of the duties imposed on the county clerk's office by statute.

1. The district court's references are to *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 79, 110 S.Ct. 2729, 2739, 111 L.Ed.2d 52 (1990) (extending *Elrod* and *Branti* to decisions to transfer, promote, recall, or hire employees solely because of political association); *Branti v. Finkel*, 445 U.S. 507, 519–20, 100 S.Ct. 1287, 1295–96, 63 L.Ed.2d 574 (1980) (preventing a newly appointed public defender who was a Democrat from discharging assistant public defenders because they did not have the support of the Democratic Party); *Elrod v. Burns*, 427 U.S. 347, 351, 372–73, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976) (declaring it unconstitutional for a newly elected Democratic sheriff to replace certain non-civil service employees "because they did not support and were not members of the Democratic Party and had failed to obtain the sponsorship of one of its leaders"); *Conklin v. Lovely*, 834 F.2d 543 (6th Cir.1987) (upholding a verdict in favor of a deputy county clerk, who was discharged for political activity).

part. The fact that defendant may have ignored the caution because Kentucky politics traditionally supported a "to the victor belong the spoils"[2] standard of conduct for newly elected officials is no reason to give defendant immunity from a claim of First Amendment violation in the circumstances of this case.

---

2. Such is how New York Governor William Learned Marcy described President Andrew Jackson's use of patronage. *See* Martin Tolchin & Susan Tolchin, *To the Victor* ... 323 (1971).

