Eva TURNER, Plaintiff–Appellee,

v.

Michael SCOTT, individually and in his official capacity, Defendant–Appellant,

City of Newport; Tom Fromme, James Kane, and Howard Niemeier, in their official capacities; John Doe I and John Doe II, individually and in their official capacities, Defendants.

No. 96–6071.

United States Court of Appeals, Sixth Circuit.

Argued April 28, 1997.

Decided July 16, 1997.

William H. Van Herp (argued and briefed), Van Herp & Howell, Covington, KY, for Plaintiff-Appellee.

David Whalin (argued and briefed), Landrum & Shouse, Louisville, KY, David R. Steele (briefed), Spalding, Hanna, Rouse & Steele, Covington, KY, for Defendant–Appellant.

Before: NELSON and NORRIS, Circuit Judges; COHN, District Judge.[*]

DAVID A. NELSON, J., delivered the opinion of the court, in which ALAN E. NORRIS, J., joined. COHN, D.J. (pp. 430–433), delivered a separate dissenting opinion.

## OPINION

DAVID A. NELSON, Circuit Judge.

This is an interlocutory appeal from an order denying qualified immunity to defen-

[*] The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan,

sitting by designation.

dant Michael Scott, a police officer. The plaintiff, Eva Turner, alleges that Officer Scott failed to prevent a fellow officer from using excessive force against her. Concluding that Scott is entitled to qualified immunity as a matter of law, we shall reverse the order of the district court.

## I

Officer Scott, a member of the Newport (Kentucky) Police Department, learned in December of 1993 that a Cincinnati resident whose pickup truck had been stolen had received several calls from people purporting to have information about the truck. The truck owner agreed to meet the latest of these callers at a Newport restaurant, where, the caller said, the pickup would be returned "for a price."

After verifying that the truck had been reported stolen, Officer Scott arranged surveillance for the meeting. The upshot was that four members of the Turner family— plaintiff Eva, her husband Jesse, her son Victor, and her daughter-in-law Christina— were arrested.

The Turners were taken to the Newport police station. There they were placed in the squad room, seated in chairs arranged in a semi-circle. Officer Scott interviewed the Turners individually, taking each to a separate room while the other three waited in the squad room. When he completed all four interviews, Officer Scott returned to the squad room to complete the paperwork on the arrests. He seated himself at a counter along the wall of the squad room, with his back to the Turners.

Officer Michael Daly, who was just beginning his shift, entered the squad room while Officer Scott was doing his paperwork. Daly picked up a shotgun and walked to the counter where Officer Scott was working. With the shotgun in his left hand and his back to the Turners, Officer Daly began rummaging through a bag he had brought with him.

As Daly fiddled with the bag, the butt of his shotgun bumped Eva Turner in the back of her head. In her own words, it was a "light bump." Although Jesse Turner was looking at Mrs. Turner, he did not notice that the shotgun touched her. He saw only a slight movement of her head. Victor Turner did see the bump, but thought it was just an accident. No one in the room said anything about this incident.

Eva Turner hunched her chair forward in order to move away from Daly. Within a few seconds of the first bump, however, she felt a blow to the back of her head. According to Jesse Turner, "[i]t was just like a bolt of lightning. You never expected it." Eva fell forward, grabbing the chair sides to keep from falling. As she turned to the left, she saw the shotgun butt. Officer Daly still had his back turned to her, as did Officer Scott.

When she felt the second blow, Mrs. Turner exclaimed, "Oh my head!" Victor Turner yelled at Officer Daly, "[W]atch what the hell you're doing with the gun!" Daly merely replied, "Oh, did I hit you?" He then left the squad room. After ordering Victor Turner to sit down, Officer Scott placed him in a holding cell. Jesse Turner described the incident to Officer Scott, who instructed the Turners to be quiet and returned to his paperwork.

Eva Turner showed no outward sign of injury. She now alleges that she felt dizzy and nauseous and had chills, but she did not tell any officer that she was injured or felt ill. Neither did she request any medical treatment. The Turners were taken to the local jail about fifteen minutes after the incident. They were released early that same evening.

Mrs. Turner brought the present civil rights action in federal district court against the City of Newport, the city's chief of police and first and second shift police commanders in their official capacities, and Officer Scott and two unknown police officers individually and in their official capacities. The complaint alleged that the defendants had used

excessive force against her while she was in custody.

In December of 1995 Mrs. Turner filed an amended complaint, substituting Lieutenant Pat Moore and Officer Michael Daly for the unknown defendants. The amendment proved unproductive; the district court dismissed the claims against Moore and Daly as barred by the one-year statute of limitations.

Officer Scott moved for summary judgment on the claims asserted against him in his individual capacity. He claimed, among other things, that he was entitled to qualified immunity.

At a hearing on the summary judgment motion the district court concluded that although "[t]here's no evidence that [Scott] knew" about the blows, the motion should be denied:

> "[I]t could be there was a conspiracy. Now, Scott, I know myself, has got a record of misbehaving and could have—you know, if there was a conspiracy and then he condoned it, you know, if they believe that these blows were struck, then they could believe, then, there was a coverup."

Following denial of his motion for summary judgment, Officer Scott perfected a timely interlocutory appeal.[1]

## II

Mrs. Turner suggests that we do not have jurisdiction over the appeal. We disagree.

■ A denial of qualified immunity on purely legal grounds is immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985). A denial of qualified immunity that turns on evidentiary issues is not. In *Johnson v. Jones*, 515 U.S. 304, 318–20, 115 S.Ct. 2151, 2159, 132 L.Ed.2d 238 (1995), the Supreme Court held that a "defendant, entitled to invoke a qualified-immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record set forth a

---

1. The motion for summary judgment was not based solely on the qualified immunity doctrine, and, as the dissent notes, the district judge largely ignored the doctrine in his remarks from the bench. When the district court entered its writ-

ten order denying Scott's motion for summary judgment, however, the court necessarily rejected the qualified immunity claim asserted in Scott's motion.

'genuine' issue of fact for trial." Interlocutory appeals are limited to rulings presenting "neat abstract issues of law." *Id.* at 316–18, 115 S.Ct. at 2158 (quotation and citation omitted); see also *Mitchell,* 472 U.S. at 530, 105 S.Ct. at 2817–18 ("a district court's denial of a claim of qualified immunity, *to the extent that it turns on an issue of law,* is an appealable 'final decision'") (emphasis added).

■ Mrs. Turner argues that summary judgment was denied in the case at bar because of the existence of genuine issues of material fact, and that this court therefore lacks jurisdiction under *Johnson.* The district court's order and the transcript of the summary judgment hearing make clear that the district judge was of a like mind.

In our view, however, this case presents a "neat abstract issue of law." For purposes of his motion, Officer Scott accepted the plaintiff's version of the facts as true. The question whether the uncontested facts demonstrated a constitutional violation is a pure question of law—and one from which an immediate appeal can be taken where qualified immunity has been denied. *Cf. Christophel v. Kukulinsky,* 61 F.3d 479, 485 (6th Cir. 1995) ("the factual dispute does not affect defendants' right to qualified immunity. The legal question squarely presented by defendants' motion was whether the facts alleged by [the plaintiff] demonstrate that defendants violated her constitutional right"); *Sanderfer v. Nichols,* 62 F.3d 151, 153 n. 2 (6th Cir.1995) ("the plaintiff's version of events, regardless of the sufficiency of the supporting evidence, does not state a claim"). If the evidence, viewed in the light most favorable to Mrs. Turner, does not establish a *prima facie* case against Officer Scott, then Officer Scott is entitled to qualified immunity as a matter of law.

The district court's assertion that there were genuine issues of material fact does not, standing alone, destroy the appealability of a qualified immunity ruling.

"Denial of summary judgment often includes a determination that there are controverted issues of material fact ... and *Johnson* surely does not mean that every such denial of summary judgment is nonappealable.

\*　　\*　　\*　　\*　　\*　　\*

*Johnson* permits petitioner to claim on appeal that all of the conduct which the District Court deemed sufficiently supported for purposes of summary judgment met the *Harlow [v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) ] standard of 'objective legal reasonableness.'" *Behrens v. Pelletier,* —— U.S. ——, ——, 116 S.Ct. 834, 842, 133 L.Ed.2d 773 (1996).

See also *Christophel,* 61 F.3d 479, 485 (6th Cir.1995)("[a] defendant's right to appeal the denial of qualified immunity does not turn on the phrasing of the district court's order").

■ If we determine, as we do here, that asserted factual disputes are not material, what remains for decision is a purely legal issue. If it were otherwise a district court could always insulate its qualified immunity rulings from interlocutory review by mouthing the appropriate shibboleth. Such a result would jeopardize the immunity from suit that the qualified immunity doctrine is designed to protect. See *Johnson,* at 310–12, 115 S.Ct. at 2155 (qualified immunity protects defendants "not simply from liability, but also from standing trial"). We conclude that we have jurisdiction to decide any purely legal issue presented by the denial of qualified immunity here.[2]

---

2. The dissent points out that Officer Scott was not spared from extended pretrial proceedings and considerable discovery. That the officer was not spared some of the burdens of litigation, however, does not mean that he should not be spared the remainder. Sometimes an immediate grant of qualified immunity would not be justified, the allegations of the complaint being sufficient to overcome that defense. But in such cases a government official will be entitled to qualified immunity after discovery if the plaintiff is unable to support his allegations with evidence. This has been clear since *Mitchell:* "Even if the plaintiff's complaint adequately alleges the commission of acts that violated clearly established law, the defendant is entitled to summary judgment if discovery fails to uncover evidence sufficient to create a genuine issue as to whether the defendant in fact committed those acts." 472 U.S. at 526, 105 S.Ct. at 2815. The amount of discovery and the duration of the pretrial proceedings are irrelevant to Officer Scott's right to qualified immunity.

## III

Government officials "performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The threshold inquiry in a qualified immunity case is whether a constitutional or statutory violation has occurred at all. *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991); *Purisch v. Tennessee Technological University,* 76 F.3d 1414, 1423 (6th Cir.1996).[3] In other words, we must first decide whether the plaintiff has stated a valid claim, or, if the parties have engaged in discovery, whether the plaintiff can demonstrate a *prima facie* case. If so, we must then decide whether the right allegedly violated was "clearly established" at the time of the defendant's actions. *Id.*

Our cases teach that, in order to hold Officer Scott liable for the use of excessive force, Mrs. Turner must prove that he (1) actively participated in the use of excessive force, (2) supervised the officer who used excessive force, or (3) owed the victim a duty of protection against the use of excessive force. See *Durham v. Nu'Man,* 97 F.3d 862, 866 (6th Cir.1996), *cert. denied sub nom. Glover v. Durham,* —— U.S. ——, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997); *Walton v. City of Southfield,* 995 F.2d 1331, 1340 (6th Cir. 1993); *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982), *cert. denied sub nom. Bates v. Bruner,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983). Neither of the first two possibilities is relevant here.

It is clear that there are circumstances under which police officers can be held liable for failure to protect a person from the use of excessive force. *Durham,* 97 F.3d at 866; *Bruner,* 684 F.2d at 426. Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring. See *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). But Mrs. Turner cannot satisfy either branch of this test.

As to the first requirement, the record is devoid of any suggestion that Officer Scott actually observed or should have known of Daly's actions. No evidence indicates that Officers Scott and Daly communicated with one another prior to or between the blows; the testimony of the Turners, indeed, was to the contrary. The Turners also testified that Officer Scott had his back turned to them throughout the entire affair.

Victor Turner, who was looking right at Mrs. Turner, saw the first bump and thought it was merely accidental. Jesse Turner, while also looking right at Mrs. Turner, saw her head move but did not notice the shotgun. Given the state of the record as a whole, no jury could possibly be permitted to find that Officer Scott knew or should have known about the initial impact.

Neither could a jury be permitted to find that Officer Scott knew or should have known that there would be a second blow. The only permissible conclusion from the record is that Officer Scott was not alerted to any problem until after the blow had been struck.

As to the second requirement, the record provides no basis for thinking that Officer Scott might have had an opportunity

3. The dissent's conclusion that the order in question here is not immediately appealable stems, we think, from a failure to recognize the significance of the threshold inquiry. The issue on a claim of qualified immunity is not *solely* whether the right alleged to be violated was clearly established. Rather, as we have said, the first step in the qualified immunity analysis is to determine whether any right has been violated at all. This is the unmistakable holding of *Siegert*—and nothing in *Johnson* purports to eliminate the first step. The *Siegert* framework explains why Officer Scott is entitled to an immediate appeal if we conclude as a matter of law that no reasonable jury could find that Officer Scott violated any right of Mrs. Turner. The *Siegert* framework also explains why it was appropriate for the parties' lawyers and the district court to focus on the facts of the squad room incident, as they did at the summary judgment hearing.

to prevent the incident. If he was entirely unaware of the first impact, he could hardly have prevented the second. Officer Daly may or may not have intended to strike Mrs. Turner, but there is not a scintilla of evidence linking Officer Scott to the harm.

The district court's speculation about a conspiracy and coverup changes nothing. Mrs. Turner did not plead a conspiracy, and there is no evidence that one existed. Officer Daly was just beginning his shift as he walked into the squad room. The record indicates that Officers Scott and Daly did not talk with each other (or even acknowledge each other) before the incident. The complaint does not allege that the two communicated in any way, and Mrs. Turner denied in her deposition that any communication occurred.

Based on other suits in which Officer Scott was a defendant, the district court apparently concluded that Scott had "a record of misbehaving...." But Officer Scott's past history would not have been admissible at trial, see Rule 404(b), Fed.R.Evid., and summary judgment rulings must be based on admissible evidence.

The order denying qualified immunity to Officer Scott is **REVERSED,** and the case is **REMANDED** to the district court with instructions to dismiss all claims against Officer Scott in his individual capacity.

COHN, District Judge, dissenting.

## I.

I dissent. In the guise of a claim of qualified immunity, defendant Scott has persuaded the majority to allow his appeal as of right from a claim that there is no genuine issue of material fact over the assertion that he stood by and allowed a fellow officer to assault plaintiff in circumstances where he could have prevented the assault. See *Durham v. Nu'Man,* 97 F.3d 862 (6th Cir.1996), *cert. denied sub nom. Glover v. Durham,* —— U.S. ——, 117 S.Ct. 1337, 137 L.Ed.2d 496 (1997); *Bruner v. Dunaway,* 684 F.2d 422 (6th Cir.1982). The majority has conflated the principles of qualified immunity with the principles governing conventional summary judgment. The majority opinion is directly

contrary to the Supreme Court's decision in *Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), as followed by us, for example, in *Barnes v. Winchell,* 105 F.3d 1111 (6th Cir.1997); *Donovan v. Thames,* 105 F.3d 291 (6th Cir.1997); and *McCloud v. Testa,* 97 F.3d 1536 (6th Cir. 1996).

Scott would be shielded by qualified immunity "insofar as [his] conduct [did] not violate clearly established ... constitutional rights of which a reasonable [police officer] would have known." *Behrens v. Pelletier,* 116 S.Ct. 834, 838 (1996) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982)). Qualified immunity is a question of law for the Court. *See Walton v. City of Southfield,* 995 F.2d 1331, 1335 (6th Cir. 1993). However, the district judge did not deal with or decide the issue of qualified immunity.

Here the district judge was dealing with rather conventional principles of § 1983 law, working in a fact-intensive environment. The district judge simply ignored the qualified immunity defense since it appeared to be a "make-weight" argument and an afterthought. The majority is using the defense of qualified immunity to enable it, on an interlocutory appeal, to reverse the district judge's decision denying summary judgment, because the majority does not find a genuine issue over the extent of Scott's knowledge of his fellow officer's attack on plaintiff and his ability to intervene to prevent it.

## II.

If the right to qualified immunity is intended to shield the defendant from extended pretrial proceedings, *see Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991) ("[o]ne of the purposes of immunity, absolute or qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed on those defending a long drawn out lawsuit"), it certainly did not do so in the district court. The complaint was filed December 13, 1994. Thereafter the record reflects 120 docket entries, an interlocutory appeal which was dismissed, frequent status reports, ex-

tensions of discovery deadlines, and production of numerous documents and detailed disclosure statements under Fed.R.Civ.P. 26(a)(2)(b). The case was ready for trial when Scott's motion for summary judgment was filed on June 18, 1996. This was shortly before the final pretrial conference set for July 19, 1996 and trial set for August 19, 1996. In the 18–month interim the parties deposed a total of 11 parties and prospective witnesses. These depositions cover approximately 1,150 pages of transcript. At the same time, the district court also had before it Scott's renewed motion to dismiss on statute of limitations grounds, previously denied on June 8, 1995, and a motion for summary judgment filed by the City of Newport and three other individual defendants. These other motions did not raise the defense of qualified immunity.[1]

Scott's motion stated in part:

The Defendant's motion is based on the facts and clearly established law that show that the Defendant:

1. Did not violate Plaintiff's federal constitutional rights; and

2. Alternatively, if any violation of Plaintiff's federal constitutional rights occurred, the Defendant is entitled to dismissal from this action on the basis of qualified immunity. Plaintiff's state tort claims against the Defendant are subject to dismissal since the undisputed facts show that the Defendant did not commit any tortious acts against Plaintiff.

The brief which accompanied the motion devoted 9 pages to a description of "The Facts" with extensive citations to the discovery record. The argument on the qualified immunity assertion covers one page of Scott's brief. The defense of qualified immunity was clearly an afterthought.[2]

Oral argument on the motions in the district court cover 39 pages of transcript with a bare mention of "qualified immunity" by the district judge as follows.

> THE COURT:...., Summary judgment on the City. What have you got against the City?
>
> MR. VAN HERP [lawyer for plaintiff]: Well, the City, by its official policy and custom—
>
> THE COURT: Well, what's the—you have to show a—some succession of events or complaints that they haven't acted. That's why I asked you about the race.
>
> MR. VAN HERP: I know. I took the liberty of sort of outlining this for discussion. First they raised the issue that it hadn't been established. This was a clearly established constitutional right at the time of the accident. That's obviously—
>
> THE COURT: That goes to qualified immunity.

Transcript of Oral Argument, July 25, 1996 (Tr.) at 7–8. At no point during the oral argument regarding Scott was the issue of qualified immunity discussed.

The district judge's reasons for denying summary judgment must be parsed from six pages of transcript. In response to the district judge's statement, "Scott—there's no direct evidence. There's no evidence that he knew," Tr. at 31, plaintiff's lawyer said: "Well, we think there's both inferential and circumstantial evidence that he knew, and his activity in the room encouraged the conduct of this junior guy. He was certainly acquiescent and it was certainly.... " *Id.*

---

**1.** The majority's reliance on language from *Mitchell v. Forsyth*, 472 U.S. at 526, 105 S.Ct. at 2815–16 (footnote 2, *supra* ) as justifying summary judgment on the eve of trial "if discovery fails to uncover evidence sufficient to credit a genuine issue as to whether the defendants in fact committed those acts," ignores the qualifier which follows:

> An appealable interlocutory decision must satisfy two additional criteria: it must "conclusively determine the disputed question," ... and that question must involve a "clai[m] of

right separable from, and collateral to, rights asserted in the action,".... 

*Id.* at 527, 105 S.Ct. at 2816 (citations omitted).

**2.** Peculiarly Scott's brief in this Court takes a slightly different tack: "In the present case, Appellee cannot identify a clearly established right and cannot establish that a reasonable police officer should have known that Scott's actions violated that right." *Brief for Appellant/Defendant Michael Scott,* at 26. This is patently incorrect.

Shortly thereafter, Scott's lawyer asked if he could make an argument on Scott's behalf. The district judge answered: "Yeah, I've been thinking about Officer Scott. You can make your argument but he's saying he— according to the testimony, he took no action." Tr. 35. The lawyer for Scott, after arguing the facts for some time, Tr. 36–39, then said:

The only thing that he [Scott] did, according to them, when he came back in the room after doing the separate interrogations, he walked over to that counter, took a statute book, threw it down on the counter and said, "I'm going to throw the book at you." That's it. There's no evidence for them to get to the fact-finder, or in this case to get passed [sic] summary judgment, against Officer Scott. It's simply not there.

Tr. 39. Immediately, the district judge said: "Motion for summary judgment will be overruled." *Id.* The formal order memorializing the district judge's ruling states in part: "The court ... finds that material issues of fact exist in this case that preclude granting the defendant's motion for summary judgment." Order of July 26, 1996.

Scott's summary judgment motion, and the district judge's denial of it, clearly and unequivocally regarded the existence of a material fact, namely whether Scott had any knowledge of the assault on plaintiff by his fellow officer. While Scott accepted plaintiff's version of the facts as true, Scott certainly did not accept the inferences that could reasonably be drawn from such facts. This is what the district judge obviously did. Even if the district judge was wrong in concluding that there was a genuine issue over a material fact, that is no warrant for allowing Scott an interlocutory appeal on the order denying the motion for summary judgment.

## III.

The substantive question in this appeal is not, as the majority puts it, a "neat abstract issue of law." p. 6, *supra. See Johnson v. Jones,* 515 U.S. 304, 316, 115 S.Ct. 2151, 2157–58 (1995). On the contrary "the issue here at stake—the existence, or nonexistence, of a triable issue of fact—is the kind of issue that trial judges, not appellate judges, confront almost daily.... And, to that extent, interlocutory appeals are less likely to bring important error-correcting benefits here than where purely legal matters are at issue...." *Id.* This is certainly a "we didn't do it" case, as Justice Breyer puts it in *Johnson. Id.*

While the majority opinion narrates a factual scenario that absolves Scott of any knowledge of the assault and hence any liability for not intervening, a reasonable scenario of the facts can be written which would require the case to go to a jury: Scott had an animus towards plaintiff. Scott was seated within a few feet of plaintiff when she was assaulted. It was a small room. When family members rose to their feet to assist plaintiff upon witnessing the assault, Scott quickly ordered them back to their seats, threatening to put them in cells if they did not comply. When questioned, Scott denied that any assault occurred at all.

What actually occurred in the room is not a question to be resolved on summary judgment, nor is it to be divined by an appellate court. Indeed, the district court would have been well within its discretion upon being confronted with the discovery deposition testimony of 11 witnesses extending over more than 1,100 pages of transcript to say, without more, that the case against Scott had to go to trial. *See S.J. Groves & Sons Co., v. Ohio Turnpike Commission,* 315 F.2d 235, 237 (6th Cir.1963). Passing that, certainly taking the facts in a light most favorable to plaintiff, which includes reasonable inferences, *Huffman v. United States,* 82 F.3d 703, 705 (6th Cir.1996), there is an issue for trial.

As noted above, the affirmative defense of qualified immunity was urged as an afterthought by Scott in his motion for summary judgment. He did not pursue it before the district judge, and the district judge did not deal with it. Justice Holmes in his dissent in *Hyde v. United States,* 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912), described what has occurred here very well when he said: "It is one of the misfortunes of the law that ideas become encysted in phrases and thereafter

for a long time cease to provoke further analysis." *Id.* at 391, 32 S.Ct. at 811.[3]

---

3. The suggestion that it is necessary for the Court of Appeals to always independently examine the record to determine whether there is a genuine issue of material fact to prevent a district court from "insulat[ing] its qualified immunity rulings from interlocutory review by mouthing the appropriate shibboleth" (p. 428, *supra*) is not well taken. District court judges take the same oath as do court of appeals judges, and in my experience observe the same principles of adjudication.