Suron JACOBS, Plaintiff/Appellee,

v.

VILLAGE OF OTTAWA HILLS, et al., Defendants/Appellants.

No. 00–3342.

United States Court of Appeals, Sixth Circuit.

Feb. 26, 2001.

Before DAUGHTREY and GILMAN, Circuit Judges; and HEYBURN, District Judge.[*]

HEYBURN, District Judge.

Defendants, police officers Michelle Miller and James Knallay, appeal from the district court's denial of qualified immunity in a § 1983 civil rights action. Jacobs, a black male, was arrested for obstructing official business and resisting arrest after the police responded to an anonymous call to check out a "lost or confused" black man near a school. After a state judge dismissed the criminal charges, Jacobs filed this civil action. The district court denied the officers' motion for qualified immunity and this appeal followed. For the reasons stated below, we AFFIRM in part and REVERSE in part.

[*] The Honorable John G. Heyburn II, United States District Judge for the Western District

## I.

Our appellate jurisdiction of this interlocutory appeal of denial of qualified immunity arises from 28 U.S.C. § 1291 as well as *Behrens v. Pelletier*, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996), *Johnson v. Jones*, 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), and *Williams v. Mehra*, 186 F.3d 685 (6th Cir. 1999). We only have jurisdiction to determine whether the facts, taken in the light most favorable to the plaintiff, show a violation of clearly established law sufficient to bar a finding of qualified immunity. *Williams*, 186 F.3d at 689.

On September 28, 1998, Jacobs, a journeyman sheet metal worker, was working at the high school in the Village of Ottawa Hills, a Toledo suburb. Jacobs arranged to meet his brother during his lunch break on the street corner near the high school. After Jacobs arrived at the corner, he noticed two police officers, Knallay and Miller, in separate cars pull up to the intersection and then continue on. The intersection is one block from the high school and two blocks from an elementary school. Students from both schools often walk home for lunch and police officers patrol the area heavily between 11:00 a.m. and noon. Miller was "suspicious to a small degree" to see Jacobs standing on the corner, where she said people did not usually stand. Although he noticed Jacobs, Knallay was not suspicious because he thought that people often stood at that intersection.

While on the corner, Jacobs noticed a fire hydrant across the street. Thinking that it would be more comfortable to sit on the fire hydrant than to continue standing, Jacobs crossed the street and sat on the five hydrant for about 10 minutes, facing

of Kentucky, sitting by designation.

the high school. Meanwhile, Sergeant Robert Overmeyer, who was working dispatch, received the following call:

Dispatcher: Ottawa Hills Police and Fire, this is Bob.

Caller: Hi—There's a guy on the corner of Evergreen and Indian—sitting on the fire . . . he was sitting on the fire extinguisher . . . doesn't look like he has a purpose and I just want to make sure the children are safe.

Dispatcher: What's he look like?

Caller: Um, he's wearing a baseball cap, he's a black guy, tee-shirt, I don't know what else, but I just want to make sure the children are safe up and down Indian.

Dispatcher: He's sitting there on the corner huh?

Caller: Just sittin' there on the corner.

Dispatcher: Okay what's your name?

Caller: Pardon me?

Dispatcher: What's your name?

Caller: Oh, well. (nervous chuckle/laughter)

Dispatcher: Mrs. anonymous?

Caller: Yes.

Dispatcher: Okay, thank you, bye.

Overmeyer then put out a call to Miller and Knallay to "[c]heck an adult. Corner of Evergreen and Indian near the fire hydrant. Report of a [sic] individual wearing a baseball cap and a tee-shirt. Should be a black male appears to be lost or confused near the intersection."

Miller arrived at the intersection before Knallay, at about 11:47 a.m. Jacobs had been at the intersection about fifteen minutes. Approaching Jacobs, Miller asked "Are you okay? Do you need any help? What's going on?" Jacobs replied that he was fine and was waiting for his brother. Miller then asked, "When is your brother coming to get you?" Jacobs told Miller that his brother was meeting him so he could show his brother how to get to the school. Miller then asked, "What are you doing on this corner?" and claimed Jacobs became very defensive and hostile. According to Miller, Jacobs would not make eye contact with her, was "moving his head around," and was "kind of flaring his arms." Miller testified that she had "never had anyone act upset to see an officer ask if he was okay," and that she was curious why he was standing at the intersection "where no one stands" when "small children were walking about." Jacobs testified that Miller then asked him what his brother's name was, and he stated, "when you first approached me you seemed as if you were here to help me . . . now you're making me feel as if you're here to harass me. What's the problem? I can't sit right here?" Miller testified that Jacobs said, "You're harassing me because I'm black. If I was white you would not have stopped, would you?" When she explained that she had received a call, Jacobs said that there seemed to be "some racial stuff" because he did not do anything wrong. According to Jacobs, Miller replied, "oh, don't give me that," and Jacobs stated, "you drove by here ten minutes ago so you pretty much know I'm not doing anything."

Miller next asked Jacobs for some identification, Jacobs declined to provide it and began crossing the street away from the officer. Jacobs told Miller he did not mean to cause any problems and that he would "just go back over here to the school." Jacobs checked the street with his peripheral vision, and as he began to cross. Miller came up behind him and grabbed his arm. Pulling his arm back, Jacobs told Miller not to touch him. Miller again grabbed Jacobs's arm, and Jacobs again pulled his arm away. According to Jacobs, Miller then told him not to hit her. Jacobs responded that he was not going to hit her. Jacobs said that he

started to walk away because he felt that Miller was "trying to start something" with him. At this point, Knallay arrived on the scene, approached Jacobs, and helped Miller handcuff Jacobs.

Knallay testified that he had received the call from the dispatcher, but arrived at the intersection after Miller. When Knallay arrived, he saw Jacobs and Miller talking, heard Miller raise her voice, and saw Jacobs begin to walk away. Knallay heard Miller tell Jacobs to stop and witnessed Miller grab Jacobs's arm twice. Recognizing that "something wasn't right," because Jacobs was "walking down the road and a police officer was walking behind him telling him to stop, and he's not doing that," Knallay ran up to Jacobs and helped Miller handcuff him.

Bringing Jacobs to her car, Miller asked Jacobs what his name was and what type of vehicle his brother drove, but Jacobs said, "no, you're going to have to explain to me what you just meant when you said we're all alike." According to Knallay, Jacobs was willing to cooperate with him, but not with Miller. After placing Jacobs in the back of the police car, Knallay asked Miller what had happened. Miller described the incident and stated that Jacobs was arrested because "he was obstructing her from doing her duty." Miller filed complaints against Jacobs for obstructing official business and resisting arrest. Granting Jacobs's motion to dismiss the criminal charges, the municipal court analyzed Miller's seizure of Jacobs as follows:

> In the case at bar, the evidence presented by the state falls well short of specific articulable facts that lead to rational suspicions. Officer Miller testified she was suspicious for the following reasons: persons usually don't stand at that corner, Defendant was hostile when she continued to question him and some serious unsolved crimes had occurred in

that general area. When the officer approached Mr. Jacobs he answered her questions. His responses were rational and his demeanor appropriate. Yet, she continued to question him. It was when he refused to answer the questions and walked away that he was arrested. None of the suspicions raised by Officer Miller rise to the articulable specific facts as contemplated in *Terry* and its progeny. The most baffling testimony in this case was Officer Miller's concession on cross-examination that when the Defendant walked away he was not under arrest and was free to leave, yet he was arrested for not cooperating in her investigation. This circular logic cannot support the State's position. The Court can only conclude that there was no probable cause to arrest Mr. Jacobs and further that no articulable facts were presented to justify a seizure after the initial brief encounter.

On February 3, 1999, Jacobs filed a complaint in state court alleging civil rights violations under 42 U.S.C. § 1983 and various state claims against the Village of Ottawa Hills, its police department, Officers Miller and Knallay, and the Chief of Police, Ronald Jornd. Defendants removed the case to federal court, and the district court denied Miller and Knallay's motion for qualified immunity on the grounds that their seizure of Jacobs had no lawful basis.

## II.

The doctrine of qualified immunity protects government officials performing discretionary functions from liability for civil damages when their conduct does not violate clearly established legal rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). We employ a three-part test to determine immunity: did a violation of a

constitutional or statutory right occur; was that right one that was clearly established and would be known by a reasonable person; and has the plaintiff alleged sufficient facts to indicate that the allegations, if proven, would be objectively unreasonable in light of the established rights. *Williams,* 186 F.3d at 691 (citing *Dickerson v. McClellan,* 101 F.3d 1151, 1157–58 (6th Cir.1996)).

The Fourth Amendment protects citizens from unreasonable searches and seizures. *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 451, 148 L.Ed.2d 333 (2000). The parties agree that neither officer had probable cause to arrest Jacobs at the beginning of the encounter; therefore, a *Terry* stop provides the only possible constitutional justification for the initial seizure. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry,* the reasonableness of Jacob's seizure depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the .interference in the first place." *Id.* at 20.

To justify the seizure, the officer must have "a reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 675, 145 L.Ed.2d 570 (2000),[1] based on "the totality of the circumstances." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Under a *Terry* stop, an officer may make inquiries affirming or dispelling her suspicions and conduct a limited pat-down search for weapons. *United States v. Butler,* 223 F.3d 368, 374 (6th Cir.2000). Though the precise outer limits of the permissible basis for reasonable suspicion have evolved over the past thirty years, the underlying rule has not been changed: officers may stop, and therefore seize, a person on the street based on reasonable suspicion and pat them down for weapons. *Wardlow,* 120 S.Ct. at 675.

The rule outlining the basic requirements for a constitutional seizure in the absence of probable cause is, by any definition, clearly established law of which a reasonable person would be aware. *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Adams v. Metiva,* 31 F.3d 375, 386–87 (6th Cir.1994); *Robinson v. Bibb,* 840 F.2d 349, 350 (6th Cir.1988). Thus, the qualified immunity depends entirely on the relationship between the *Terry* requirements and the facts alleged by the Plaintiff. Because Officers Miller and Knallay arrived on the scene at different times and had different circumstances surrounding their actions, we must separately examine their claims for qualified immunity.

### A.

■ Officer Miller's interaction with Jacobs began when she first saw him standing on the corner. She then received a dispatch reporting a lost or confused black male on the corner and she returned to investigate. When she began her discussion with Jacobs, she had no basis to support a reasonable suspicion that criminal activity was afoot. She had merely seen a man waiting on a corner and subsequently received a dispatch requesting investigation of a lost or confused individual. That the corner was near a school or that children might be present gives the officer reasons to closely scrutinize the area, but

---

1. Since the Supreme Court issued *Wardlow* well after the incident at issue here, the law it clearly establishes is not relevant to the evaluation of Miller's and Knallay's conduct.

However, the Court's review of the *Terry* line of cases in *Wardlow* illustrates the central themes in the stop-and-frisk analysis since *Terry. Wardlow,* 120 S.Ct. at 677–78.

does not give her reason to seize and arrest citizens. Unlike *Terry,* where the location—outside a store—was a factor in the officer's suspicion that criminal activity—robbery—was afoot, here the location does not reasonably inform the officer's suspicion of criminal activity. Therefore, a *Terry* stop is justified only if during the course of her consensual conversation, Miller gained a reasonable suspicion of criminal activity.

In the conversation that followed, Jacobs answered Miller's initial questions but broke off the conversation in a defensive and hostile manner, claimed that Miller's questions were racially motivated, and walked away when Miller requested identification. Defensive and hostile behavior based on stated racial allegations during a discussion with a police officer cannot, on its own, provide the basis for reasonable suspicion of criminal activity sufficient to justify a *Terry* seizure. *See, e.g., Florida v. Bostick,* 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (holding that "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."). Similarly, walking away from consensual conversation with an inquisitive officer is the paradigmatic right of any participant in such an encounter. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (holding that the "person approached, however, need not answer any question put to him; indeed he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so." (citations omitted)). To be sure, an "unprovoked flight" can form the basis for a *Terry* stop. *Illinois v. Wardlow,* 528 U.S. 119, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). However, that is not our case. Jacobs did not flee. Rather, he walked away from the encoun-

ter and stated his intention to return to his original location, the school. Miller contends that Jacobs threatened to hit her, thus justifying the seizure. However, we examine the facts in the light most favorable to the Plaintiff.

The factors identified by Miller as forming the basis of her suspicion of Jacobs do not meet the minimal standards of reasonable suspicion in *Terry.* Consequently, we agree with the district court that Miller is not entitled to qualified immunity.

### B.

■ When Officer Knallay arrive on the scene, Miller was already following Jacobs across the street, raising her voice and ordering Jacobs to stop. Knallay saw Jacobs walk away from Miller, and then Miller attempt to grab Jacobs. He then approached and helped Miller handcuff Jacobs. While officers must affirmatively intervene to prevent other officers from violating an individual's constitutional rights, *Bruner v. Dunaway,* 684 F.2d 422, 426 (6th Cir.1982), that obligation does not extend to questioning the basis for a fellow officer's reasons for arrest in this situation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) (holding that "officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes· or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official," (citations omitted)). The lack of basis for Miller's seizure rendered it unconstitutional. Because Knallay arrived after Miller had begun the seizure and did not observe or have reason to know the basis for Miller's seizure, he did not violate clearly established law in helping Mil-

ler handcuff Jacobs. He is therefore entitled to qualified immunity.

For the reasons stated above, we AFFIRM the district court's denial of qualified immunity for Officer Miller, REVERSE the denial of qualified immunity for Officer Knallay, and REMAND the case for further proceedings consistent with this opinion.