NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0231n.06

No. 22-5409

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| BAILEY WHITE, as Administrator of the Estate of Shandle Marie Riley, deceased, | ) ) ) | **FILED** |
|  | ) | May 18, 2023 |
| Plaintiff-Appellee, | ) ) | DEBORAH S. HUNT, Clerk |
| v. | ) ) | ON APPEAL FROM THE |
| JACOB GOFORTH, in his individual and official capacity as a Deputy Sheriff of Hamilton County Government, | ) ) ) ) | UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE |
|  | ) | OPINION |
| Defendant-Appellant. | ) ) |  |

Before: McKEAGUE, THAPAR, and LARSEN, Circuit Judges.

LARSEN, Circuit Judge. On a winter night in 2019, Hamilton County Sheriff's Deputy Jacob Goforth received an unusual phone call from fellow on-duty officer, Daniel Wilkey. Wilkey, whom Goforth knew to be a preacher outside of work, asked Goforth to witness a baptism at a nearby lake. Although surprised, Goforth agreed, assuming that Wilkey was baptizing someone he knew from church. He wasn't. Unbeknownst to Goforth, Wilkey had stopped Shandle Riley earlier that evening and found her in possession of marijuana. Wilkey told Riley that if she agreed to let him baptize her, he would issue her a citation and not take her to jail. She agreed and followed Wilkey in her car to a nearby lake. When Goforth arrived, he saw what appeared to be a consensual, if improper, situation. Wilkey proceeded to baptize Riley, while Goforth filmed on his cellphone. Critically, however, Goforth never learned of Wilkey's improper quid pro quo. Riley sued Goforth under 42 U.S.C. § 1983, claiming that he was liable for failing to intervene in

Wilkey's violation of her First and Fourth Amendment rights. The district court denied Goforth qualified immunity as to those claims. We REVERSE.

I.

In the evening hours of February 6, 2019, Hamilton County Sheriff's Deputy Jacob Goforth received a call in his squad car from fellow officer, Daniel Wilkey.[1] Wilkey, whom Goforth knew to be a preacher outside of work, asked Goforth to drive to a boat launch on Soddy Lake to witness a baptism. Goforth was, understandably, taken aback: "[W]hen [Wilkey] first said it, it didn't really sink in what he'd just said, so I asked him to clarify, and he told me again." Goforth assumed that Wilkey was planning to baptize someone he knew from his church. Arriving at the boat launch, Goforth saw Wilkey's parked patrol car, which was blocked in by a civilian car. He saw Wilkey and a woman "talking, [and] joking around." Two towels were "sitting on the hood" of one of the cars. Goforth asked Wilkey, "Hey, what exactly are you doing here? Because it looks like you're, you know, about to baptize this woman." Wilkey confirmed that was the plan. Goforth made a comment about how cold it was and said something like: "Are you sure about this?" or "I don't know about this."

Wilkey introduced Goforth to the woman, Shandle Riley,[2] and told Goforth that Riley "wanted to be baptized." In getting ready to enter the lake, Wilkey told Riley that he was going to take his uniform off but asked Riley to keep her clothes on. Wilkey removed all his clothing except

---

[1] The evening's events are largely captured by dashcam video from Wilkey's patrol car and the video taken by Goforth on his cellphone, although audio is limited. We recite the facts in the light most favorable to Riley, except where contradicted by the videos. *See Hooper v. Plummer*, 887 F.3d 744, 757 (6th Cir. 2018); *Scott v. Harris*, 550 U.S. 372, 378 (2007).

[2] Riley passed away on April 13, 2022. The district court substituted Bailey White, the administrator of Riley's estate, as the real party in interest. For ease, the opinion continues to refer to plaintiff/appellee as Riley.

his compression shorts and t-shirt. Goforth learned, "right before [Wilkey] went to baptize" Riley, that Wilkey had issued her a citation earlier that night. Wilkey and Riley entered the water, and Wilkey baptized Riley, holding one hand on her back and the other on her front, and quickly submerging her in the lake. Goforth filmed the incident on his cellphone.

In his deposition, Goforth was asked why he didn't report Wilkey or stop him from baptizing Riley. Goforth offered two reasons. First, "Riley seemed like she wanted this to take place. She was very vocal about it." Goforth "thought she was a willing participant and wanted to be baptize[d] by Wilkey, who [he] underst[ood] [was] a preacher outside of work." Second, "[w]hile [Goforth] found it unusual what he was doing, the setting and the time, and especially the season that he was doing it in, [he] didn't find it to be wrong per se." When asked why he filmed the incident, Goforth explained, "I filmed it because I wanted to ensure that Ms. Riley wasn't going to allege some kind of sexual misconduct. Because obviously I know what a baptism entails. I understand where hands are going to be, things like that. So I decided I'm going to film this in case she tries to say that, you know, X, Y, and Z happened."

Unbeknownst to Goforth, the following events had transpired earlier in the evening. After leaving work, Riley had driven to her ex-mother-in-law's house, stopping first at a gas station. When she left the gas station, Wilkey followed her in his patrol car. He stopped Riley in the driveway of her ex-mother-in-law's house. Wilkey approached the vehicle and asked what Riley had in the car. She admitted that "[t]here was a marijuana roach in [her] cigarette pack." Wilkey had Riley exit the car. He then searched Riley and her car, finding only the marijuana mentioned by Riley.

Somehow, Wilkey and Riley began discussing religion. Riley testified, "I don't know how, when and where, he asked me if I'd been baptized." Wilkey told Riley that if she "got baptized

-3-

he'd give [her] a citation and [she] could go about [her] business, because God was talking to him." He told Riley that if she "let him baptize [her], he wouldn't take [her] to jail." He also told her that he would go to court and speak on her behalf if she agreed to be baptized. Riley testified that she "would much rather get baptized in freezing cold water than go to" jail. In addition, she testified that she "felt like [she] had no choice but go to Soddy Lake and do the baptism. [She] didn't want to go to jail." At the same time, Riley said that she went along with the baptism because she "really thought he was a God-fearing, church-like man who saw something, like, in me, that God talked to him" and "it felt good to believe that for a minute."

Wilkey told Riley to go into her ex-mother-in-law's house to get towels for the baptism. After Riley got the towels, Wilkey issued her a citation for possessing marijuana. Wilkey then told Riley to follow him in her car. She proceeded to follow Wilkey to a boat launch about ten minutes away. When asked whether Wilkey gave her the option not to follow him, Riley responded, "[I]t wasn't by gunpoint . . . or anything," and "I'm a grown woman and I know I didn't have to do it." Wikey then baptized Riley, as described above.

After exiting the lake, Wilkey and Riley briefly hugged. When asked why she hugged Wilkey, Riley said that she "was just trying to get the heck out of there." Riley also testified that Goforth smirked at her and that it became apparent that the baptism "had nothing to do with God" or "with saving" her. Rather, "[i]t had something to do with power and control." Riley testified that she left immediately after hugging Wilkey, though a dashcam video indicates that she stayed for a few minutes. From Goforth's view, "Upon emerging from the lake after the baptism, [Riley] hugged Daniel Wilkey. We then walked up the ramp to the cars where I heard her laughing and talking with Wilkey. She also said thank you to him." Riley departed, while Goforth and Wilkey continued talking.

Riley sued Hamilton County, Wilkey, and Goforth in state court, raising numerous federal and state-law claims. The defendants removed the case to federal court. Goforth moved for summary judgment on all the claims against him. The district court granted the motion in part and denied it in part. Pertinent to this appeal, the court denied qualified immunity to Goforth on Riley's § 1983 claims for violating her First and Fourth Amendment rights. The claims against Wilkey and the County remain pending.

## II.

We review the district court's summary judgment decision and its denial of qualified immunity de novo. *Franklin Am. Mortg. Co. v. Univ. Nat'l Bank of Lawrence*, 910 F.3d 270, 275 (6th Cir. 2018); *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001). Summary judgment is appropriate when, drawing all inferences in favor of the nonmovant, there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Franklin Am. Mortg.*, 910 F.3d at 275 (citations omitted). "[A] defendant challenging the denial of summary judgment on qualified immunity grounds must be willing to concede the most favorable view of the facts to the plaintiff for purposes of the appeal." *Hopper v. Plummer*, 887 F.3d 744, 757 (6th Cir. 2018) (citation omitted).

"[Q]ualified immunity prevents government officials from being held liable if (1) the officers did not violate any constitutional guarantees or (2) the guarantee, even if violated, was not 'clearly established' at the time of the alleged misconduct." *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992 (6th Cir. 2017) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The court must grant qualified immunity if either prong is satisfied. *Pearson*, 555 U.S. at 241–42. An officer has not "violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was

violating it.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)). Once a defendant asserts qualified immunity, the "plaintiff bears the burden of showing that the defendants are not entitled to" it. *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

Riley does not contend that Goforth personally violated her constitutional rights. Instead, she seeks to hold Goforth liable for failing to intervene in two alleged constitutional violations committed by Wilkey—an unlawful seizure in violation of the Fourth Amendment and a coerced baptism in violation of the First Amendment's Establishment Clause. Successful failure-to-intervene claims are rare and largely limited to one context—the use of excessive force. In that context, "a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). The Supreme Court has not extended failure-to-intervene liability beyond those borders.[3] At the time of the incident, our court had found officers liable for failing to intervene in an unlawful arrest in one published case.[4] *See Bunkley v. City of Detroit*, 902 F.3d 552, 566 (6th Cir. 2018); *see also Jacobs v. Village of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001). And we know of no case from this or any other circuit that has held an officer liable for failing to intervene in an Establishment Clause violation. From

---

[3] The Supreme Court has not yet made clear whether any precedent other than its own can clearly establish law for § 1983 purposes. *See Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

[4] We note that in *Bunkley*, our court quoted a district court opinion for the proposition that "the Sixth Circuit ha[d]" previously recognized that "failure to intervene extends beyond the excessive force context." *Bunkley*, 902 F.3d at 565 (quoting *Holloran v. Duncan*, 92 F. Supp. 3d 774, 794–95 (W.D. Tenn. 2015)). But the case the district court cited for that proposition, *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973), is not a failure to intervene case at all.

the start, then, Riley's claims against Goforth are on shaky ground because, for a right to be clearly established, the "legal principle must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). And the plaintiff usually must produce a case illustrating that legal principle at work in a closely analogous factual setting, so that every reasonable officer would have fair warning that his conduct was unlawful. *See Arrington-Bey*, 858 F.3d at 992–93. Riley's claims fail because she cannot do so.

*Fourth Amendment.* Take first Riley's claim that Goforth failed to intervene in Wilkey's unlawful seizure of her. Goforth would be liable for failure to intervene only if he (1) "observe[d] or ha[d] reason to know that" Riley was being unlawfully seized and (2) "had a realistic opportunity to intervene to prevent the harm from occurring." *Bunkley*, 902 F.3d at 565–66 (citation omitted). The critical question in this case is what Goforth had reason to know.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A "seizure" requires either "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). Whether a person has been "seized" by a "show of authority," as Riley alleges here, depends on "whether the officer's words and actions would have conveyed . . . to a reasonable person" that she was "being ordered to restrict [her] movement." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). "Examples of circumstances that might indicate a seizure" by show of authority "would be the threatening presence of several officers, the display of a weapon by an officer, . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Our question, though, is not whether a reasonable person in Riley's shoes would have thought she

was not free to leave. Our question is whether *Goforth* should have known—or more accurately, whether every reasonable officer in Goforth's shoes should have known—that a reasonable person in Riley's shoes would have felt that she had been seized. On the facts available to Goforth during this incident, we answer that question, "no." *See Kisela*, 138 S. Ct. at 1153.

As a predicate to determining Goforth's liability, the district court determined that Wilkey had unlawfully seized Riley for the purposes of the baptism. The court relied on several facts. First, Riley denied that she had consented to the baptism. *Riley v. Hamilton Cnty. Gov't*, 2022 WL 1051784, at *6 (E.D. Tenn. Apr. 7, 2022). Second, "Riley had already been pulled over, handcuffed, and detained for nearly two hours by an on-duty, uniformed officer driving a marked police vehicle." *Id.* Third, "[s]he had surrendered marijuana she knew she was not legally allowed to have." *Id.* Fourth, Riley agreed to the baptism in part because Wilkey had told her that if she agreed, he would give her a citation only and she could avoid jail. *Id.* And fifth, "Wilkey had also called and requested the presence of an additional on-duty officer for the baptism." *Id.* Of these, Goforth knew only one—that he was the officer called to the scene.

The district court also identified two additional facts supporting the conclusion that Goforth had reason to know that Wilkey had seized Riley. First, Goforth learned, just before the baptism, that Wilkey had issued Riley a citation. *Id.* at *8. Second, "[s]ome of the language Wilkey used after Goforth arrived could also have put Goforth on notice that Riley was seized." *Id.* Specifically, the court highlighted Wilkey telling Riley, "You please keep your clothes on," and Wilkey telling Goforth to "watch [Wilkey's] back" while he undressed. *Id.* Given the interlocutory posture of this appeal, we must take these facts as true and as support for Riley's position. *See Plumhoff*, 572 U.S. at 772–73. But the district court did not discuss the rest of the record, and that lies entirely in Goforth's favor.

-8-

Goforth was not privy to the conversations between Wilkey and Riley that led to the baptism, and he had no knowledge of Wilkey's quid pro quo. When Goforth arrived, he saw that Riley had driven her own car to the boat launch. Riley had parked behind Wilkey's car, meaning that Wilkey's car, not Riley's, was blocked in. Goforth observed that Riley was standing outside of the car and was not handcuffed or secured. He saw Riley and Wilkey laughing and talking in a friendly manner. He saw Wilkey unholster his weapon and remove his uniform. He then observed Riley enter and exit the lake on her own accord, hug Wilkey, and continue chatting with him in a friendly manner after the baptism.

Goforth's involvement with Wilkey and Riley was limited both in duration and in terms of what he knew. He knew what minimal information Wilkey had conveyed, and everything Goforth personally observed largely indicated that Riley was at the boat launch of her own volition and free to leave at any point. Based on these facts, we could surely say that every reasonable officer should have known that this situation was highly unorthodox. But that is not the question before us. The Fourth Amendment question asks whether Riley was being held against her will; the duty-to-intervene question asks, among other things, whether Goforth should have known it; and the qualified-immunity question asks whether *every* reasonable officer in Goforth's position would have understood that he had a duty to intervene. Given what Goforth knew at the time, we cannot say that every reasonable officer in Goforth's situation would have known that Riley was not a willing participant, free to leave when she wished, but had instead been unlawfully seized. And without knowledge of the underlying constitutional violation, Goforth cannot be liable for failing to stop it. *See Turner*, 119 F.3d at 429.

Our circuit caselaw doesn't help Riley. She offers *Bunkley v. City of Detroit* to show that the duty to intervene in an unlawful arrest is clearly established in our court. To be sure, the court

in *Bunkley* held that "[t]he duty of law enforcement officers to intervene to prevent an arrest not supported by probable cause was stated in precedent 'clear enough that every reasonable official would interpret it to establish' this rule." 902 F.3d at 566 (quoting *Wesby*, 138 S. Ct. at 590). But general legal principles "do not suffice on their own. '[C]learly established law' may not be defined at such 'a high level of generality.'" *Arrington-Bey*, 858 F.3d at 992 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). Instead, a plaintiff must nearly always "identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires." *Id.* at 993 (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)). *Bunkley*'s facts aren't remotely similar to these.

In *Bunkley*, the plaintiff sued several police officers for false arrest and failure to intervene. 902 F.3d at 555. The district court denied qualified immunity on the failure-to-intervene claim, and this court affirmed. *Id.* Qualified immunity wasn't appropriate, the court said, where the officers had arrested the plaintiff for murder despite knowing that (1) they had not investigated the shooting, (2) the plaintiff didn't match the descriptions given by the victim of the shooting, (3) they hadn't questioned the plaintiff; and (4) they made up a false reason for arresting the plaintiff. *Id.* at 566. *Bunkley*'s facts are far removed from the facts of this case and can't support a clearly established finding. *See Arrington-Bey*, 858 F.3d at 993. So "existing law [hadn't] placed the constitutionality of [Goforth's] conduct 'beyond debate.'" *Wesby*, 138 S. Ct. at 589 (quoting *al-Kidd*, 563 U.S. at 741).

Riley also offers *Jacobs v. Village of Ottawa Hills*, 5 F. App'x 390, 395 (6th Cir. 2001). But "a plaintiff cannot point to unpublished decisions to meet [the] burden" of showing that a right was clearly established. *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022). And, in any event, *Jacobs* hurts Riley more than it helps. In *Jacobs*, an officer wasn't liable for failing to

-10-

intervene in an unlawful arrest because he "arrived after [another officer] had begun the seizure and did not observe or have to reason to know" the unconstitutional basis for the seizure. 5 F. App'x at 395. The same is true here; Goforth arrived near the end of the encounter and lacked key facts to know that Wilkey had unlawfully seized Riley.

Riley has not shown that Goforth violated her clearly established Fourth Amendment rights, so Goforth is entitled to qualified immunity on this claim.

*First Amendment*. Riley's Establishment Clause claim fares no better. The Constitution provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The Supreme Court "has instructed that the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2428 (2022) (quoting *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014)).

Riley asserts that Wilkey's coerced baptism of her violated the Establishment Clause. That may well be so. Coercion "was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.* at 2429. Accordingly, "government may not coerce anyone to attend church, nor may it force citizens to engage in a formal religious exercise." *Id.* (citation omitted). Threatening jail time for refusing Christian baptism seems an easy fit for this category. But even if Wilkey violated Riley's constitutional rights, Wilkey is not before us; only Goforth is. There is nothing in the record indicating that Goforth knew of Wilkey's quid pro quo, and Riley doesn't argue that he did.[5] Absent that

---

[5] In its opinion, the district court said, without explanation, "There are genuine disputes of material fact concerning whether Riley was coerced into the baptism, whether she would have faced harsher penalties had she refused to be baptized, *and whether Goforth should have known that Riley was being coerced.*" *Riley*, 2022 WL 1051784, at *11 (emphasis added). But there is no record support for the assertion that Goforth might have known of Wilkey's quid pro quo and Riley does not argue that there is. Reading this statement as a reference to the quid pro quo would also contradict another portion of the opinion. With respect to the First Amendment claim, the court dispensed

knowledge, Goforth could not have violated Riley's clearly established First Amendment rights. So "[o]n this record, [Goforth] plainly did not violate any clearly established law." *City of Tahlequah v. Bond*, 142 S. Ct. 9, 11 (2021) (per curiam).

The district court thought that, even absent coercion, it was clearly established that an officer in Goforth's position would be "liable for failing to intervene if a reasonable observer" would have perceived a governmental endorsement of religion, as defined by the *Lemon* test and its progeny. *Riley*, 2022 WL 1051784, at *11; *see also Lemon v. Kurtzman*, 403 U.S. 602, 612– 13 (1971). And, although finding "no cases directly addressing the circumstances Goforth faced," the district court thought that no case was necessary. *Riley*, 2022 WL 1051784, at *12. Instead, "based on the state of the law at the time, Goforth had fair warning that he had a duty to stop" Wilkey's violation of the "reasonable observer" test. *Id.*; *see Wesby*, 138 S. Ct. at 590 (noting that "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances"). We cannot agree. First, *Kennedy* clarified that the Supreme Court had "long ago abandoned *Lemon* and its endorsement test offshoot." *Kennedy*, 142 S. Ct. at 2427. If that is so, then Goforth could not have had a clearly established duty to stop Wilkey from violating it. And even in its heyday, the boundaries of *Lemon*'s "abstract . . . approach to the Establishment Clause" were far from clear. *Id.* The approach "'invited chaos' in lower courts, led to 'differing results' in materially identical

---

with Goforth's argument that he lacked knowledge of the coercion by concluding that "the absence of coercion does not end the inquiry." *Id.* (citation omitted). Accordingly, we read the district court's statement as referencing its earlier conclusion that genuine disputes remained regarding whether Goforth had reason to know that Riley had been seized, or detained against her will, for the purposes of a baptism. But, as explained above, it was not clearly established, on the facts available to Goforth, that he should have known of the seizure or that he had a duty to intervene.

cases, and created a 'minefield' for legislators.'" *Id.* (citation omitted). A doctrine like that is unlikely to produce the "obvious case." *See Wesby*, 138 S. Ct. at 590.

Moreover, we can find no case that had *ever* found an officer liable where his fault was not his *own* endorsement of religion, but his failure to intervene in *someone else's*. *See Rojas v. City of Ocala*, 315 F. Supp. 3d 1256, 1287 (M.D. Fl. 2018), *vacated on other grounds*, 40 F.4th 1347 (11th Cir. 2022) (granting qualified immunity because of "the lack of authority that would warn the [defendant] that he could be liable for failing to intervene to prevent" an Establishment Clause violation). Absent any such case, we struggle to see how the contours of any duty to intervene could be "so well defined" that it would have been "clear" to Goforth "that his conduct was unlawful in the situation he confronted." *Wesby*, 138 S. Ct. at 590 (citation omitted).

Whatever one might say about Wilkey's conduct, his case is not before us. And we must assess Goforth's liability individually. Given that there is no evidence in the record that Goforth knew of any coercion, Goforth's liability is not "obvious." *See White*, 580 U.S. at 81 (concluding that a case that "presents a unique set of facts and circumstances" is not an "obvious" case). He is entitled to qualified immunity on the First Amendment claim.

* * *

We REVERSE the district court's denial of qualified immunity to Goforth.